## DAVIS v. UNITED STATES.
### Crim. A. No. 6096.

United States District Court
D. Minnesota, Third Division.

Aug. 11, 1954.

Harlan B. Strong, Minneapolis, Minn., and Howard H. Gelb, St. Paul, Minn., were appointed by the Court to represent petitioner and appeared in his behalf.

George E. MacKinnon, U. S. Atty., and Alex Dim, Asst. U. S. Atty., St. Paul, Minn., appeared in behalf of the United States.

NORDBYE, Chief Judge.

This matter comes before the undersigned, one of the Judges of the above-named Court, upon petitioner's motion for an order vacating and setting aside a life sentence imposed upon him on June 7, 1935, upon a plea of guilty entered on June 3, 1935, to an indictment charging that he conspired with others to, and did, kidnap one Edward George

Bremer, of St. Paul, Minnesota, and transport him into the State of Illinois. The hearing commenced on July 7, 1954, and was concluded on July 12, 1954.

The proceedings are instituted under Section 2255, Title 28 U.S.C.A. Petitioner contends that he was sentenced without the advice of counsel; that he did not know of his right to counsel; that he did not waive counsel; that he was led to believe that if he entered a plea of guilty he would be given a term of years; that he was not taken before a United States Commissioner; that he was not given a copy of the indictment; and that he was held incommunicado. The trial court who sentenced Davis denied the motion without a hearing. An appeal was taken and in Davis v. United States, 8 Cir., 210 F.2d 118, the Court of Appeals held that, while the files and records sustained the trial court's finding that petitioner stated that he did not desire the advice of counsel at the time of his plea, that there was no requirement on the date of the arraignment and plea that he be furnished with a copy of the indictment, and that it was not necessary that he be taken before a United States Commissioner when he was arrested pursuant to a Grand Jury indictment, nevertheless the allegations in the petition that he did not know of his constitutional right to counsel and that, not knowing of that right, did not voluntarily waive it by entering a plea of guilty, and in that the record did not conclusively show that defendant was entitled to no relief on his allegations that he had been deprived of counsel, he should not be deprived of his right to a hearing on his motion to vacate his sentence. The complaint that he had been held incommunicado was held by the Court of Appeals to be incidental to his claim that he did not know of his right to counsel and that he did not waive that right. The Court of Appeals thereupon reversed the order of the trial court and remanded the matter for further proceedings.

After the mandate had been returned by the Court of Appeals, petitioner was removed from the place of his incarceration to St. Paul a substantial period prior to July 7, 1954, when the hearing was held, so as to arrange for the appointment of counsel and to enable counsel thus appointed adequate time to prepare for the hearing. The right to subpoena witnesses at the expense of the Government was accorded petitioner and all the witnesses he desired to call and who could be located were made available to him.

It appears from the evidence that petitioner is now 52 years of age; that in 1935 he had schooling equivalent to a sixth grade education; that when he was 17 years of age he was sentenced and served a term in the Oklahoma Penitentiary for a felony; that in February, 1923, when he was 21 years of age, he was tried before a jury, found guilty of murder, and sentenced to the Oklahoma Penitentiary for life. At that trial, he was represented by counsel. He was confined in the Oklahoma Penitentiary until November 3, 1932, at which time he was granted an eight months' leave of absence by the Governor of that State. During the time he was incarcerated, he was in solitary confinement for a substantial period by reason of one escape and one attempted escape from the penitentiary. Subsequently, his eight months' leave was extended twelve months, but after that extended stay expired, he deliberately failed to return to the penitentiary and became a fugitive. During this furlough from prison, he became associated with the notorious Barker-Karpis gang, some of whose members, among other crimes, committed the kidnapping of Edward Bremer at St. Paul. Bremer was kidnapped on January 17, 1934, and transported to Bensonville, Illinois. He was held for $200,000 ransom, and when the ransom was paid, he was released. On January 22, 1935, two indictments were returned by the Grand Jury of the District of Minnesota—one charging Arthur Karpis, Arthur Barker, Volney Davis, and many others, with the crime of conspiracy to kidnap Bremer at St. Paul and transport him to Illinois, and the other charging certain defend-

ants, including Davis, with the substantive offense of kidnapping Bremer. In February, 1935, Davis was captured by agents of the F.B.I. at Kansas City, but made his escape when the airplane in which he was being transported to Chicago became grounded. On April 15, 1935, Arthur R. Barker and several other defendants named in the conspiracy indictment were placed on trial at St. Paul, Minnesota. On May 17, 1935, Barker and several other defendants were found guilty. Barker and one Oliver A. Berg were sentenced to life imprisonment. Davis was arrested again on June 1, 1935, by the F.B.I. at Chicago. Upon his arrest, he was taken to the F.B.I. headquarters at 1900 Bankers Building in that city, where he was questioned and where he made a written statement to F.B.I. agents Suran and Chaffetz setting forth his association with the Barker-Karpis gang; that he was living in St. Paul and associated with them at the time of the Bremer abduction; that he left St. Paul on or about January 18 or 19, 1934, and went to Chicago; that he continued to remain with the Barkers, receiving money from them off and on thereafter; that after the kidnapping, he, as well as Arthur Barker and others, were operated on by one Dr. Moran to remove the fingerprint patterns from their fingers and to change their facial expressions by operations on their noses and ears. He denied in the statement any participation in or connection with the Bremer kidnapping or that he had knowingly received any of the Bremer ransom money.

In support of his petition herein, he states that when he was arrested in Chicago on June 1st, he was struck on the head by a gun or some blunt instrument and that a gun was discharged dangerously near to his head when he was ordered to put up his hands. He contends that, by reason of this experience, he became frightened and unnerved. It is his position that he was held incommunicado by the F.B.I. after his arrest; that he was questioned during the afternoon of June 1, 1935, and until late that night; that he was not given any food or permitted to call a lawyer; and that he was told by the representatives of the F.B.I. that he did not need a lawyer in that they were all lawyers and would look after his rights. He states that while he was in the F.B.I. headquarters in Chicago he was held a prisoner in a small room, handcuffed and shackled, and obtained very little, if any, sleep. He states that he was removed from Chicago on a chartered plane en route to St. Paul some time during the afternoon of June 2nd, but that turbulent weather was encountered near Madison, Wisconsin, so that the plane was forced to land; that thereafter two attempts were made to take off from Madison for St. Paul, but the stormy weather required the pilot to return to Madison. It is his testimony that this harrowing experience unnerved him and when on the third attempt the plane was able to proceed to St. Paul, he was exhausted mentally and physically; that he had had no sleep and no food until he arrived in St. Paul early Monday morning, June 3rd; that he was handcuffed and shackled during the entire airplane trip and when he arrived in St. Paul he was taken to the Federal Building there and placed in one of the rooms occupied by the F.B.I.; that he arrived at the F.B.I. headquarters in St. Paul about six o'clock A.M.; that he was taken to court at about ten o'clock A.M. on the morning of June 3rd, where he was arraigned on the indictment charging him with the crime of conspiracy. He contends that he was told by various representatives of the F.B.I. that if he entered a plea of guilty to the crime of conspiracy, he would get a term of years and that he did not need a lawyer; that his association with the Barker-Karpis gang was sufficient to connect him with the conspiracy charged in the indictment. Upon his arraignment, he states that the court asked him if his name was Volney Davis, and thereafter the indictment charging conspiracy was read to him. He contends that he asked the court what the penalty was and that the court stated that it was up to life. Thereafter, he contends he entered a plea of guilty.

He states that he was not asked by the court if he was represented by counsel, or if he desired counsel. After entering his plea, sentence was deferred until June 7th and he was removed to the Ramsey County Jail. He contends that between June 3rd and June 7th, he did talk to a lawyer; that the lawyer did not come to see him regarding his case, but that there was casual conversation between them regarding the plea that had been entered by petitioner to the conspiracy indictment in the Bremer case. Davis contends that he asked the lawyer whether or not he could withdraw his plea, but that he was informed by the lawyer that it would be impossible for him to withdraw his plea; and that he, Davis, was "sunk". Thereafter, on June 7, 1935, he states he was brought into court for sentence, and he contends that thereupon the court said, "You have entered a plea of guilty to conspiracy," to which he responded "Yes." Then he contends the court said, "Do you have a lawyer?" And he responded, "No, I don't need one, do I?" And that the court thereupon stated, "No, you don't." Whereupon, he contends that the court sentenced him to life imprisonment on his plea of guilty on June 3rd.

It was petitioner's position on this hearing that he believed the F.B.I. agents when they told him that his association with the Barker-Karpis gang would be sufficient to connect him with the crime of conspiracy as charged; that he did not know that he had a constitutional right to counsel; that he was never informed by the court that he was entitled to have counsel, or that the court would appoint counsel for him if he was unable to retain counsel; and that his plea of guilty was brought about by the suggestion of the F.B.I. agents, his mental confusion and exhaustion because of the events that took place between June 1st and June 3rd and his assumption that he would obtain a term of years and also to avoid going back to Oklahoma where he had been kept in solitary confinement prior to his furlough due to two attempts to escape.

Obviously, if Davis' relation of the facts herein is sustained, it seems evident that there is substance to his contention that he never intelligently, understandingly, and in a competent manner, waived the aid of counsel. But after hearing all the evidence, I am convinced that, as observed by the Court of Appeals with reference to petitions of this kind, "lapse of time and wishful thinking ripen into a conviction that events were as alleged, when in fact they were not." At page 122 of 210 F.2d.

The escape of Davis from the State Prison in Oklahoma and from the F.B.I. agents in February, 1935, fully warranted the authorities in taking adequate safety precautions to prevent another escape. His proclivities in that regard were demonstrated again after he was sentenced on June 7, 1935, and when, in removing him to a Federal institution, the Deputy Marshals found concealed on his person a small spring which he evidently intended to use to spring his handcuffs and thus aid him in making his escape. In any event, though he was handcuffed and shackled between the 1st and 3rd of June, prior to being taken into court, Davis does not contend that he was mistreated or abused in any way by the F.B.I. He does state that he was struck over the head by something when arrested, but that alleged episode is not sustained by the evidence. True, a gun of one of the arresting officers was discharged, but that occurred when Davis suddenly threw up his hands and unintentionally struck the arm of an officer, causing the gun to be accidently discharged. When he was confined at the F.B.I. headquarters in Chicago, he was offered food and drink and, to the extent that he participated therein, was prompted by his own desires. That he slept at times in the Chicago headquarters and when the plane was waiting for some hours in Madison is made to appear by the testimony of various witnesses. The statement which he gave to the F.B.I. indicates a coherent and alert mind. It sets forth in great detail his association with the Bremer kidnappers, but he took

particular pains in giving his statement to make it appear that he was not directly involved in the kidnapping or in any conspiracy to perpetrate that crime. It persuasively appears from the testimony of many of the F.B.I. agents that when Davis was in their custody, he was affable, cooperative, and evidently greatly relieved that he had been captured and was no longer a fugitive. There was nothing in his manner or speech which indicated in any way that he was not entirely normal and fully possessed of all of his faculties. Before he was removed to St. Paul, the special agent in charge of the F.B.I. at Chicago discussed with him the question of his removal and told him that he had a right to be taken before a duly authorized court commissioner for the purpose of determining whether under the law he should be removed. But after having been informed of his rights in this regard, he freely and voluntarily signed a consent to be removed without appearing before any court commissioner for a hearing.

It is evident from the testimony that before June 3, 1935, Davis knew of the result of the Barker trial and the verdict of guilty on May 17, 1935, and that life sentences had been imposed upon some of the defendants. No doubt the airplane trip from Chicago to St. Paul was fraught with some worry and anxiety on the part of all of the passengers, but when the weather permitted the continuation of the flight from Madison, Wisconsin, to St. Paul, the trip was uneventful and good flying weather was encountered. The contention that Davis was so mentally distressed and exhausted upon arriving in St. Paul that his mental faculties were not normal is entirely overcome and is not sustained by the evidence before me. And if it be suggested that there was an unseemly haste between his arrest and the date of his arraignment, that was apparently brought about by reason of Davis' own desire to have the matter over with as soon as possible. No doubt there was conversation between the F.B.I. agents and Davis regarding the retaining of counsel, but the evidence does not sustain Davis' contention that the agents told him that he did not need counsel or that they were lawyers and would look out for his interests. It is incredible that the agents would be so naive as to suggest any such plan to a seasoned criminal who had been a close associate of the Barker-Karpis gang. In any event, the agents unequivocally deny any such suggestion and testified that they repeatedly told Davis in Chicago and in St. Paul before his arraignment that he was entitled to have a lawyer represent him and that if he was unable to hire a lawyer, the court would appoint counsel for him. Davis had told the F.B.I. agents before he went into court that he was going to enter a plea of guilty to the conspiracy charge but not to the indictment charging him with the actual kidnapping; that the F.B.I. had the "goods" on him and that it would not do him any good to fight. The persuasive evidence is that Davis told the agents that he did not want a lawyer because Barker's lawyer had not accomplished anything for him, and instead of paying money to a lawyer he wanted to use his available funds for the purpose of helping out his parents. Davis had some $300 on his person when arrested, and an additional sum of $800 available to him in a place which he did not disclose at that time to the agents. I am firmly of the opinion from the evidence that Davis made up his mind to enter a plea of guilty to the conspiracy charge because he was convinced he would be found guilty if he stood trial and that he was reconciled to a life sentence because he was a fugitive from the Oklahoma Penitentiary where he was under such a sentence. The evidence does not sustain Davis' contention that any of the F.B.I. agents or Mr. Heisey, the Assistant United States Attorney, told him that if he entered a plea of guilty he would get a term of years, or that his association with the Barker-Karpis gang was sufficient to convict him of conspiracy. Mr. Heisey testified that he had never talked to Davis at any time.

It should be stated that in 1940 Davis sought a writ of habeas corpus in the

Northern District of California when he was confined at Alcatraz, upon the grounds that his sentence in this Court was illegal and that he had been deprived of his liberty without the benefit of counsel. The writ was denied upon the grounds that "the records of the case disclose that the petitioner intelligently waived the right to counsel." The habeas corpus proceeding was submitted upon affidavits in an ex parte proceeding, and although the Court of Appeals in Davis v. United States, 8 Cir., 210 F.2d 118, found that the affidavits before the California court furnished ample justification for the conclusion that Davis' claims were without merit, it concluded that the decision of the California court on ex parte affidavits did not deprive appellant of his right to have a hearing under Section 2255, at which time he could be present and present his evidence before the court.

■■ In light of the evidence at the hearing herein, did Davis make a competent and intelligent waiver of his constitutional rights to counsel, with a full understanding of the implications of such waiver, when he entered his plea of guilty on June 3, 1935? In answering that question, I am fully apprised of the duty and responsibility which rest upon a trial court to determine whether an accused understandingly waives the aid and assistance of counsel and the implications therefrom, and that the fact that "an accused may state that he is informed of his right to counsel and desires to waive such right does not automatically end the responsibility of the court." Snell v. United States, 8 Cir., 174 F.2d 580, 582. The question whether an accused has waived his rights under the Sixth Amendment in a competent manner necessarily must be determined on the particular facts and circumstances of each case. An inexperienced and bewildered individual brought into court for the first time to face a criminal charge may require a long and thorough examination by the court in order to be assured that he understandingly waives the assistance of counsel. On the other hand, many individuals with a criminal background and long association with the underworld are so fully apprised of their rights to the proverbial mouthpiece from previous court experience and their associations that a less thorough examination may not only suffice, but any extended examination would be an utter superfluity. Then, again, the demeanor, the facial expression, and the responses made by the accused soon may convincingly disclose to an experienced trial judge whether the accused is intelligently and understandingly waiving his constitutional rights. And, of course, the law does not require the court to force an attorney upon an accused. The trial judge concluded from all the facts and circumstances made to appear to him when Davis was arraigned on June 3, 1935, that Davis intelligently and competently waived the assistance of counsel. Judge Joyce, the trial judge, appeared as a witness at this hearing and testified that his recollection of the Davis case had been refreshed over the years because of his correspondence with members of the Davis family and with Davis himself, and also by reason of the habeas corpus proceeding instituted by Davis in California in 1940. Judge Joyce testified that when Davis appeared before him on June 3, 1935, he asked him if he had a lawyer and that Davis responded in the negative. Then he asked him if he wanted a lawyer and Davis again responded in the negative. Thereupon, Judge Joyce testified that he asked him if he had funds with which to hire a lawyer and that if he did not, a lawyer would be appointed by the court without cost to him. Then, according to Judge Joyce, Davis stated that he did not want a lawyer, but that he wanted the conspiracy indictment read to him. The clerk was thereupon ordered to read the indictment, which was done, and the clerk then asked Davis what his plea was— guilty or not guilty, and that Davis responded "Guilty." The indictment was not phrased in involved legal language which would be difficult for a layman to understand or comprehend. Judge Joyce testified that upon observing Davis' demeanor and appearance, and in light of

the questions propounded and the answers made, he was of the firm opinion, and still is, that Davis intelligently and understandingly waived the services of counsel; that when Davis was sentenced on June 7, 1935, there was no colloquy whatsoever between him and Davis regarding counsel, and the testimony given by Davis that at that time in response to the court's question as to whether he had counsel he asked the court if he needed counsel and the court stated that he did not, is unequivocally denied by Judge Joyce, as well as by many other witnesses who appeared for the Government at this hearing.

The clerk's record is silent on the question of the petitioner's knowledge of his right to counsel and his waiver of such right. It merely states, "Upon being questioned by the court, said defendant stated that he did not desire the advice of counsel and entered a plea of guilty to the charge in the indictment." But the trial court's recollection of the colloquy between him and Davis on June 3, 1935, is corroborated in the main and with some additions by court attaches, newspaper men, deputy marshals, and F.B.I. representatives. One or more of the witnesses testified that they distinctly recollected that Judge Joyce called to Davis' attention the seriousness of the charge when he advised him about his right to have counsel. One of the newspaper men called as a witness by the Government testified that on June 3, 1935, after Davis had entered his plea, he talked to Davis at the Ramsey County Jail and that Davis at that time stated in substance that when he heard the indictment read he knew that "the Government had the stuff on him and that he expected that the Government would throw the book at him and give him life." As indicative of the normal mental outlook of Davis and the full understanding and appreciation of what his plea of guilty involved and of the sentence he would probably obtain, reference may be made to a letter he wrote to his parents and sister on June 3, 1935, when he was in the Ramsey County Jail and after he had entered his plea of guilty. The first paragraph of this letter reads, in part,

"At last I am in a position where I can write to you all again. And I am sure glad that I can for it has been awful to be running around over the country and not being able to write to the only ones in this world that really love me. I am here in jail and have entered a plea of guilty to conspiring in this case. I guess you have read about it in the papers. I will be sentenced on Friday this week. I don't know what I will get but I expect it will be a life sentence."

Moreover, in support of the testimony given by the F.B.I. agents that Davis stated to them that he did not care to hire a lawyer with the funds that were available to him but preferred instead to turn this money over to his parents, a receipt was introduced in evidence dated November 21, 1935, which, according to the testimony of an F.B.I. agent, was received from Davis' mother when he delivered to her at Davis' request the sum of $1,143.40. This money was in the possession of, or available to, Davis at the time of his arrest. Davis does claim that he was told by the F.B.I. agents that he, Davis, did not have any money to hire a lawyer because his money would be confiscated, but the testimony of the agents denying any such statement and the ultimate disposition of the money to Davis' mother strongly negate the testimony of Davis in this regard.

The testimony given by Davis that the attorney who interviewed him after he had entered his plea of guilty, but before sentence, that he could not withdraw his plea of guilty and was "sunk", or words to that effect, is categorically denied by the attorney in question, who testified in behalf of the Government.

■ The issue of a petitioner's guilt or innocence is not before the court on a motion under Section 2255. But petitioner here voluntarily injected that issue into the proceeding when he testified that he was not guilty of the charge contained in the indictment and had no connection

with the Bremer kidnapping conspiracy. In light of that testimony, the Court permitted the Government to call a witness who was closely associated with Davis during the period in question and who gave damaging and convincing testimony as to Davis' complicity and participation in the offense to which he entered a plea of guilty. This testimony was competent, at least in so far as it tended to bear upon the credibility of Davis' testimony on the material issues herein.

After due reflection and consideration of all of the evidence, I have come to a sustained and abiding conviction that when Volney Davis entered his plea of guilty on June 3, 1935, he competently, intelligently, and understandingly waived his constitutional rights to be represented by counsel under the Sixth Amendment to the Constitution of the United States, with a full understanding of the implications thereof. The above may be considered as the Court's findings of fact herein. It follows, therefore, as a conclusion of law that the petitioner's motion must be denied. It is so ordered.

An exception is allowed.