**UNITED STATES of America,**
**Plaintiff,**

v.

**LaVere REDFIELD, Defendant.**

**Cr. No. 13324.**

United States District Court
D. Nevada.

March 23, 1961.

---

Howard W. Babcock, U. S. Atty. for Dist. of Nevada, Las Vegas, Nev. (at present with the firm of Babcock & Sutton, Las Vegas, Nev.), Clyde R. Maxwell, Jr., Asst. Regional Counsel, I. R. S., San Francisco, Cal. (at present associated with the firm of Faulkner, Sheehan & Wiseman, San Francisco, Cal.), for the United States.

William O. Bradley, Grubic, Drendel & Bradley, Reno, Nev., for defendant.

ROSS, Chief Judge.

## I. Preliminary Matters.

On October 28, 1960, a jury found defendant to be guilty on six counts of an eight-count indictment charging willful evasion of federal income taxes. On November 1, 1960, defendant, appearing *pro se,* filed a motion for new trial. On November 3, 1960, defendant, through his newly retained counsel, filed another motion for new trial, which motion, we take it, supersedes that filed on November 1, 1960. On November 10, 1960, at the request of defendant's counsel, this Court granted a continuance on the motion for new trial, on the ground that a proper resolution of the motion could not be made until such time as a transcript of the trial record could be made available both to counsel and to this Court. On February 21, 1961 and on March 1, 1961, the parties filed their respective memoranda of points and authorities in support of or in opposition to the instant motion. Oral argument was had on March 3, 1961, followed by the government's filing, per stipulation approved by this Court, additional documentation, namely, reports of psychiatrists, to which we refer infra.

To begin with, we note that a motion for new trial is addressed to the discretion of this Court. Naval v. United States, 9 Cir., 1960, 278 F.2d 611, 615; Straight v. United States, 9 Cir., 1959, 263 F.2d 811, 813; Adams v. United States, 9 Cir., 1951, 191 F.2d 206, 207; Eagleston v. United States, 9 Cir., 1949, 172 F.2d 194, 200, certiorari denied 1949, 336 U.S. 952, 69 S.Ct. 882, 93 L.Ed. 1107.

Furthermore, it is well settled that motions for new trials are not favored. United States v. Costello, 2 Cir., 1958, 255 F.2d 876, 879, certiorari denied, 1958, 357 U.S. 937, 78 S.Ct. 1385, 2 L.Ed.2d 1551, and that they should be granted only with great caution. United States v. Costello, supra, 255 F.2d at page 879; United States v. Pruitt, D.C.S.D.Tex. 1954, 121 F.Supp. 15, 17, affirmed 5 Cir., 1954, 217 F.2d 648, certiorari denied 1955, 349 U.S. 907, 75 S.Ct. 584, 99 L.Ed. 1243. Finally, we would point out that harmless error, that is, any error which does not affect substantial rights, shall be disregarded. Federal Rules of Criminal Procedure, Rule 52(a), 18 U.S.C. In other words, in order to prevail on this motion defendant must show that the errors at the trial, if any, were prejudicial to him. United States v. Evett, D.C.N.D. Cal.1946, 65 F.Supp. 151, 152; Union Electric Light & Power Co. v. Snyder Estate Co., D.C.W.D.Mo.1936, 15 F.Supp. 379, 382. And, the burden of demonstrating prejudicial error is on the defendant. United States v. Segelman, D.C.W.D.Pa.1949, 86 F.Supp. 114, 117; cf., United States ex rel Darcy v. Handy, 1956, 351 U.S. 454, 462, 76 S.Ct. 965, 970, 100 L.Ed. 1331 (habeas corpus proceeding, wherein the Supreme Court stated that the burden must be sustained " 'not as a matter of speculation but as a demonstrable reality.' "); cf., Myres v. United States, 8 Cir., 1949, 174 F.2d 329, 332 (appeal), certiorari denied 1949, 338 U.S. 849, 70 S.Ct. 91, 94 L.Ed. 520; see also, United States v. Smith, D.C.D.C.1959, 179 F.Supp. 684, 686–687, which notes that a motion for new trial will be granted only "if the Court finds that there is a reasonable probability that there has been a miscarriage of justice * * *."

Before we proceed to apply these principles to the instant motion, we note that several points of error are alleged in the motion filed on November 3, 1960, but which were not alluded to either in defendant's memorandum or in his oral argument. Since he has not dignified these matters by way of supporting argument,

we take it that he has waived them, as well he might, since they are clearly devoid of merit.[1]

## II. Waiver of Right to Counsel.

The first point which defendant urges is that "defendant was not capable of competently and intelligently waiving his constitutional right to assistance of Counsel."

■ Although the Sixth Amendment to the United States Constitution preserves the right to be assisted by counsel, it is clear that said right may be waived. Adams v. United States ex rel. McCann, 1942, 317 U.S. 269, 275, 63 S.Ct. 236, 87 L.Ed. 268; Johnson v. Zerbst, 1938, 304 U.S. 458, 465, 58 S.Ct. 1019, 82 L.Ed. 1461. Indeed, the constitutional right "does not justify forcing counsel upon an accused who wants none." Moore v. State of Michigan, 1957, 355 U.S. 155, 161, 78 S.Ct. 191, 195, 2 L.Ed.2d 167; Linden v. Dickson, 9 Cir., 1960, 278 F.2d 755, 763; MacKenna v. Ellis, 5 Cir., 1959, 263 F.2d 35, 41, certiorari denied 1959, 360 U.S. 935, 79 S.Ct. 1453, 3 L.Ed.2d 1546; United States v. Cantor, 2 Cir., 1954, 217 F.2d 536, 538. And, a conviction will be reversed if it appears that a trial court has compelled a defendant to be represented by counsel against his will. Reynolds v. United States, 9 Cir., 1959, 267 F.2d 235, 236; compare United States v. Cantor, supra, 217 F.2d at page 538, where the court observed that appointment of counsel amounted to "some curtailment of his right to proceed

alone, and if any prejudice to the appellant was the result of that the judgment should be reversed."

■ There can be no doubt but that defendant had waived his right to assistance of counsel. On June 16, 1960, some two and a half months prior to the commencement of trial, a hearing was held in open court for purpose of arraignment, at which time this Court asked defendant whether he was represented by counsel, to which question defendant responded in the negative. Reporter's Transcript of Proceedings, vol. I, p. 4, lines 14–16 (hereinafter cited as Tr.). The Court specifically advised him that he had a right to be represented by counsel, Tr., vol. I, p. 4, lines 17–20, and then inquired as to whether defendant had sufficient funds with which to employ counsel. Tr., vol. I, p. 4, lines 21–22. Mr. Redfield responded by stating: "I do not wish representation." Tr., vol. I, p. 4, line 23. Within a moment or so, defendant again stated; " * * * I would prefer to represent myself." Tr., vol. I, p. 5, line 3. There then followed the following colloquy:

"The Court: Very well. It is your desire, then, that you not be represented, but that you represent yourself in this case?

"Mr. Redfield: That is my desire.

"The Court: And on the basis of that you have refused the Court's offer to appoint counsel for you?

---

1. The first two points which are raised by the motion, but not supported by the memorandum or argument, are that the verdict was contrary to the weight of the evidence and not supported by substantial evidence. As we shall point out, later in this opinion, the evidence of defendant's guilt was overwhelming, and in light thereof it would have been a miscarriage of justice had the jury acquitted. The motion also alleges that the Court erred in charging the jury and in refusing to charge the jury as requested. Quite aside from the fact that defendant has, under Rule 30 of the Federal Rules of Criminal Procedure, waived his right to assign error because he failed to object to the instructions before the jury retired, we cannot even find one statement by de-

fendant at this time which points out where the Court erred, except his reference to the so-called Allen instruction, with which matter we deal extensively later in this opinion. Suffice it to say that the instructions were a fair, complete and accurate statement of the applicable principles of law. The motion also alleges that the Court denied the defendant the right to cross-examination. Beside the fact that the record shows exactly to the contrary, we note that defendant has failed to cite instances of this alleged conduct on the part of the Court, unless, of course, he had in mind the occasions when the Court reprimanded or otherwise cautioned defendant as to the rules relating to the proper scope of cross-examination.

"Mr. Redfield: Yes, your Honor." Tr., vol. I, p. 5, lines 9–15.

There followed various hearings and informal conferences between defendant and this Court, all of which will be discussed presently. However, on the first day of the trial, October 4, 1960, the transcript shows the following:

"The Court: The record will indicate that the defendant, LaVere Redfield, has heretofore waived the right to have an attorney, and has elected to represent himself.

"Is that correct, Mr. Redfield?

"Mr. Redfield: That is so, your Honor." Tr., vol. I, p. 39, lines 24–25, p. 40, lines 1–3.

Since the record is crystal clear that there was a waiver of counsel, the remaining question is whether there has been a competent, intelligent and understanding waiver, which problem we shall deal with in Section III, infra. But, we must first consider defendant's argument, raised in his memorandum at page 6, that "the record in the case at bar does not establish that the Court made any determination as to whether or not the defendant competently and intelligently waived his right to Counsel." This argument was extended in the March 3, 1961 hearing, when defendant apparently took the position that a new trial was required *because* this Court allegedly did not make a finding of record. Indeed, if we understand him, defendant asserts that there was reversible error because this Court did not have a special hearing, presumably one akin to the hearing we have under 18 U.S.C. § 4244.

Should this Court determine at this time that defendant did not properly waive his right to assistance of counsel, then of course he is entitled to a new trial. But, it is quite another matter to ask for a new trial on the ground that there was no formal hearing and determination of record at the time defendant did waive his right.

Defendant relies heavily on the passing statement in Johnson v. Zerbst, 1938, 304 U.S. 458, 465, 58 S.Ct. 1019, 1023, 82 L. Ed. 1461, that "while an accused may waive the right to counsel, whether there is a proper waiver should be clearly determined by the trial court, and it would be fitting and appropriate for that determination to appear upon the record."

The Court of Appeals for the Ninth Circuit answered defendant's argument in the case of Widmer v. Johnston, 9 Cir., 1943, 136 F.2d 416, 418, certiorari denied 1943, 320 U.S. 780, 64 S.Ct. 92, 88 L.Ed. 468. There the Court noted that its attention had been directed to the passage quoted from Johnson v. Zerbst. It went on to hold, however:

"While it would doubtless be a better practice to record the fact of a determination of proper waiver of counsel, still the failure to do so does not negative that such determination was made. The recordation would go merely to the matter of proof." 136 F.2d at page 418.

We might agree with defendant had there been any indication at the time of his waiver that defendant was not possessed of his complete mental faculties. Under those circumstances, it may have been appropriate to have had a psychiatric hearing. But, in Hall v. Johnston, 9 Cir., 1939, 103 F.2d 900, it was pointed out that at the time of the defendant's plea of guilty the trial judge knew that defendant was "insane," 103 F.2d at page 900; yet, the Court of Appeals did not order a reversal of the conviction, but merely remanded for a *present* hearing as to whether defendant understandingly waived his right to counsel. 103 F.2d at page 901.

It is all too easy to say at this stage of the proceedings what would have been the most wise course of action to follow at the time defendant waived his right. Even in light of the passage from Johnson v. Zerbst, however, the Courts of Appeals time and again have affirmed convictions or denied writs of habeas corpus where no more, and often less, was done by the trial court than was done here. See, e. g., Williams v. Swope, 9 Cir., 1951, 186 F.2d 897, 898–900; O'Keith v. Johnston, 9 Cir., 1942, 129 F.2d 889, 891, cer-

tiorari denied 1942, 317 U.S. 680, 63 S.Ct. 161, 87 L.Ed. 546; Binder v. United States, 6 Cir., 1956, 231 F.2d 314, 314–315, certiorari denied 1956, 351 U.S. 969, 76 S.Ct. 1036, 100 L.Ed. 1488; Smith v. United States, 5 Cir., 1954, 216 F.2d 724, 726; Ray v. United States, 5 Cir., 1951, 192 F.2d 658, 659; Woolard v. United States, 5 Cir., 1949, 178 F.2d 84, 88; Ossenfort v. Pulaski, 5 Cir., 1948, 171 F.2d 246, 247; Wood v. Howard, 7 Cir., 1946, 157 F.2d 807, 808, certiorari denied 1947, 331 U.S. 814, 67 S.Ct. 1198, 91 L.Ed. 1832.

■ In any event, although we desire to go on record as holding that, at least where there is no prima facie indication that a defendant is mentally incompetent, there is no need to have a special hearing of record, psychiatric or otherwise, to determine whether a defendant competently has waived his right to counsel, we further hold that the failure to have such a hearing in this case is not ground for a new trial, since, as we shall show, defendant did competently waive his right to counsel. In other words, even assuming *arguendo* that such special hearing was necessary, the lack of it did not prejudice this defendant, and, as we pointed out earlier, new trials will be granted a defendant only when there is a clear showing that the alleged error resulted in prejudice to him.

III. Defendant Waived His Right to Counsel in an Intelligent, Understanding and Competent Manner.

Our purpose now is to reaffirm the previous determination of this Court that defendant did competently, intelligently and understandingly waive his right to counsel. Although a formal determination of record was not made at the time defendant waived his right, the Court had an adequate opportunity to discuss the matter with defendant, both on and off the record, and did determine for itself that defendant's choice to appear *pro se* was made with his "eyes open." See Adams v. United States ex rel. McCann, 1942, 317 U.S. 269, 279, 63 S.Ct. 236, 87 L.Ed. 268.

To begin with, this defendant cannot say here, as did the defendant in the famous case of Johnson v. Zerbst, supra, 304 U.S. at page 467, 58 S.Ct. at page 1024, that he was unaware of his right to be represented by counsel. The Court advised him of that right. Tr., vol. I, p. 4, lines 17–20.

■ The Court then determined that defendant was financially able to retain counsel if he desired to do so. Tr., vol. I, p. 4, lines 21–25, p. 5, lines 1–8, p. 31, lines 10–18. Since defendant was able to retain counsel, it was not necessary to appoint counsel. See Rule 44, Federal Rules of Criminal Procedure ("If the defendant appears in court without counsel, the court shall advise him of his right to counsel and assign counsel to represent him at every stage of the proceeding *unless he elects to proceed without counsel or is able to obtain counsel.*"); United States v. Arlen, 2 Cir., 1958, 252 F.2d 491, 495 ("counsel need not be assigned if a defendant is able to obtain his own counsel * * * ."). Nonetheless, defendant knew of and refused the Court's offer to appoint counsel for him. Tr., vol. I, p. 5, lines 13–15.

It is clear, then, that defendant was well aware of his constitutional and statutory rights.

The next fundamental question is whether defendant knew what he was getting into. Did he appreciate that any law suit is complicated, at least to a layman, and that a criminal charge is a matter not to be dealt with lightly? The record shows that he did.

The Court pointed out that no matter how skilled the layman is in the fundamental rules of law, no lay person is very familiar with procedural aspects, and that that fact makes it difficult both for the defendant appearing *pro se* and for the Court. Tr., vol. I, p. 7, lines 5–12. The Court asked defendant whether he thought the trial of the charges against him was child's play, to which he replied that he had no such thought. Tr., vol. I, p. 17, lines 19–25, p. 18, lines 1–2. The Court impressed upon defendant that he was in an important and grave situa-

tion, and the defendant, with a seriousness which the cold record does not show, responded that he was aware of those facts. Tr., vol. I, p. 18, lines 3–7.

The defendant was well aware of the charges against him. Upon arraignment, the indictment was read to him, and a copy was handed to him. Tr., vol. I, p. 6, lines 6–14. As a matter of fact, as we shall discuss infra, the defendant was sufficiently aware of what was going on that he demanded a bill of particulars. The Court advised him of the possible penalties should he be adjudged guilty. Tr., vol. I, p. 7, lines 17–23. This defendant knew of the ultimate consequences should his prosecutors prevail.

What this Court has so far related is important in that it shows that defendant was well aware of what he was doing. Significant, however, is the manner in which defendant made his statements and responded to the queries of the Court. Everything that he did or said was done in a calm, deliberate and convincing manner. When he stated that he desired to represent himself, there was no hesitation in his voice. When he stated, "I feel I am competent to defend myself," Tr., vol. I, p. 14, line 20, he did so with that convincingness that comes from the totally rational man who speaks with a soft voice. At all times relevant to the matter now under inquiry he was alert, courteous, and determined. Who will deny that "the demeanor, the facial expression, and the responses made by the accused soon may convincingly disclose to an experienced trial judge whether the accused is intelligently and understandingly waiving his constitutional rights."? Davis v. United States, D.C. D.Minn.1954, 123 F.Supp. 407, 412, affirmed 8 Cir., 1955, 226 F.2d 834, certiorari denied 1956, 351 U.S. 912, 76 S. Ct. 702, 100 L.Ed. 1446.

Although it is not totally uncommon for a defendant to waive counsel,[2] this

Court was concerned about defendant's determination to do so, mainly because of the type of suit here involved. Defendant, whether represented or not, would not have an easy time of it, since from past experience the Court knew that the government would be well prepared, as, indeed, it was. Between the time of arraignment on June 16, 1960 and the time the trial began, on October 4, 1960, this Court had occasion to meet with defendant in camera. There were three to five such conferences, often as not dealing with defendant's desire to obtain a bill of particulars. On at least two of these occasions, there may have been more, the Court frankly discussed the matter of waiver with defendant, told him what he was getting into, and virtually pleaded with him to reconsider his determination to appear pro se. The defendant was adamant, but not in a belligerent manner. It was simply a case where an undeniably intelligent businessman had made an assessment of where he stood and what he wanted to do about it. He was stubborn about his decision, but gave absolutely no indication that he did not know exactly what he was doing.

Which leads us to another matter. It needs no citation to the transcript or otherwise for this Court to note that defendant is an eminently successful financier. He has amassed a considerable fortune, and in the course of doing so doubtless had to make decisions on which could turn the fate of hundreds of thousands, if not millions, of dollars, a subject which even he asserts is dear to his heart. See defendant's memorandum in support of this motion, p. 26, lines 25–26, where Dr. Raymond Brown states that "he has quite literally placed money above his life in his perspective of values." This, then, was not one of those waiver-of-counsel cases where the court found a 17 year old defendant, who had never gone beyond the third grade, who had had virtually no contact with the outside

---

2. A check of the records for the Las Vegas division of this Court shows that during 1960 there were 93 defendants who entered pleas to criminal charges, 10 of whom waived counsel. Some 49 defendants were sentenced in Las Vegas, 10 of whom waived counsel at the time of imposition of sentence.

world, and who was not accustomed to making decisions which were extremely important to him. In short, this Court respected the man for what he was; there was no question in the Court's mind but that however poor his judgment may have been, the defendant's waiver of counsel was done in an intelligent, understanding and competent manner.

Once he had waived counsel, the Court made it plain to defendant that "it can't be an attorney for you; it can't tell you what to do, how to do it, or when to do it." Tr., vol. I, p. 18, lines 11–12. The Court also impressed upon him that he had no more standing because he was defending himself than would any other person. Tr., vol. I, p. 18, lines 21–23. All of this he gave every indication of having understood. Despite this clarification of the ground rules, so to speak, the defendant never waivered from his determination to appear *pro se.*

So much, then, for the factual background upon which this Court based its conclusion that there was a proper waiver of counsel, a conclusion which, though not expressed as a matter of record, was one which was uppermost in the Court's mind when it decided to allow defendant to defend himself.

But, we are now told by psychiatrists of defendant's own choosing that he was incompetent to waive his right. On the other hand, one psychiatrist chosen by the government states that he cannot reach a conclusion, and the other unequivocally states that defendant did competently and intelligently waive his right. Nothing would be gained by adding up the "votes," as it were, and then reaching a conclusion one way or the other. We deem it our function to compare these reports, and then to evaluate them in light of the findings which this Court has made and will make on the basis of its own observations.

Drs. Raymond Brown and Toller, both of whom were retained by defendant, say, in essence, that defendant is obsessed with money, that he has a compulsion to make money and that money assumed more than natural proportions to him.

When they point out that he has certain eccentric characteristics, both rely on incidents which show that defendant is parsimonious. Dr. Raymond Brown mentions ambulatory schizophrenia, while Dr. Toller alludes to the possibility. Dr. Raymond Brown concludes that defendant has a distorted sense of values, which conclusion obviously relates to defendant's great desire for money. Dr. Toller says that defendant gives as a reason for waiver of counsel the fact that he would have to earn too much money to pay for fees. In short, both men seem to agree that somehow or other the decision to waive counsel was motivated by an inner desire to save money. Dr. Raymond Brown concludes that the decision to appear *pro se* was motivated by irrational factors, which simply means that it is that doctor's opinion that the decision to maintain his fortune by doing without counsel is irrational.

On the other hand, Dr. Gericke, who was retained by the government, disputes Dr. Raymond Brown's judgment that the decision was irrational. Said Dr. Gericke: "His thinking and behavior appear reasonable, and he suffered no disorder of thinking which would render his actions irrational or unwarranted. He acted in the exercise of his best judgment."

In an apparent attempt to pinpoint a specific mental disorder which allegedly caused defendant to sacrifice representation by counsel merely because he could save some money, Dr. Raymond Brown speaks of "extreme obsessive compulsive traits" and Dr. Toller states that the defendant "has a psycho-neurosis, compulsive type." Dr. Gericke, who had before him the Brown-Toller reports at the time he made his findings, concluded, however: "There is no evidence of impulsiveness nor emotional instability." Quite aside from the obvious fact that the experts do not agree, this Court is of the opinion that to say that defendant has a compulsive desire to accumulate wealth is of no help in this case. Many people have compulsive desires to make money, and often as not wind up in a

hospital because of various illnesses induced by overwork. But, although these men, many of whom are members of our profession, may be said to exercise poor judgment, few could doubt that their actions are competent, intelligent, or understanding in the legal sense. Or, as Dr. Richard Brown, who was retained by the government, has succinctly put it: "Some of the possibilities would be that he simply wanted to save money. This would represent poor judgment but if the man were psychotic and felt, for example, that he had to have money to keep away the devil, his judgment would be based on a delusion." In this connection, both Drs. Toller and Gericke agree that defendant has not been suffering from hallucinations, and none of the experts has concluded that defendant is psychotic. Dr. Toller's view that defendant is suffering from a psycho-neurosis unquestionably cannot be taken as a conclusion that he is psychotic, for the term "psychoneurosis" is commonly used merely as a synonym for "neurosis." Chapman v. Finlayson Lease, 1940, 56 Ariz. 224, 107 P.2d 196, 198; O'Kelly & Muckler, Introduction to Psychopathology 202 (2d ed., 1958) ("The term psychoneurosis is used interchangeably at present with the shorter term neurosis.").

We would be concerned if there had been a finding that defendant was suffering from a psychosis but there is a vast difference between that type of mental illness and a neurosis. To begin with, we are told that a neurosis is a "mild functional personality disorder in which there is no gross personality disorganization and in which the patient does not ordinarily require hospitalization." Coleman, Abnormal Psychology and Modern Life 632 (1950). More precisely, the "psychoneuroses are mild or minor mental reactions which represent attempts to find satisfaction in life situations rendered unsatisfactory by faulty attitudes or by faulty emotional developments." Strecker, Ebaugh & Ewalt, Practical Clinical Psychiatry 358 (6th ed., 1947). "The psychoses, on the other hand, are usually disordered reactions of such intensity or such inclusiveness with respect to all parts of the personality that any sort of compromise with normal social requirements is impossible." O'Kelly, op. cit. supra, at 202–03. Unlike the neurotic, "the behavior in the psychotics is usually unpredictable and very frequently anti-social to the extent that it makes him dangerous to himself or to the persons around him. The psychotic does not appreciate the rights of other persons and thus has difficulty in conforming to the demands and mores of the group in which he lives. In a few words, the psychoneurotic patient generally is in much closer contact with his environment than the psychotic and, as it were, far fewer phases of his personality are in obvious disharmony with the responsibilities and expectations of everyday living." Strecker, op. cit. supra, at 358–59. See also, Coleman, op. cit. supra, at 233.

Even assuming for purposes of argument that Dr. Toller was correct in his diagnosis of neurosis, a diagnosis which, we hasten to point out, is not concurred in by the other psychiatrists, how much weight should we give to it, bearing in mind that we have cited authorities which classify a neurosis as being only a mild or minor mental reaction? Should we be more concerned here than was the Court of Appeals for the Fifth Circuit, when it found that there was a competent waiver, even though one of two psychiatrists there had testified that that defendant was suffering from manic depression insanity and could not even stand trial? Kaplan v. United States, 5 Cir., 1957, 241 F.2d 521, 522, note 3, certiorari denied 1957, 354 U.S. 941, 77 S.Ct. 1406, 1 L.Ed.2d 1539. Should we find no valid waiver when the Court of Appeals for the Second Circuit found a valid one even though two psychiatrists had testified that the defendant there "was a psychopathic personality and in need of treatment * * *."? United States ex rel. Rhyce v. Cummings, 2 Cir., 1956, 233 F. 2d 190, 194, certiorari denied 1956, 352 U.S. 854, 77 S.Ct. 78, 1 L.Ed.2d 64.

This Court desires again to point out that defendant is not a man inexperienced

in making decisions as to how to spend his money. Just because he used what may have been an inordinate amount of care on the occasion here in question, why should we say now that his actions are any less competent, intelligent and understanding than the man who refuses to take out that extra, but needed, fire insurance on his home, or the man who refuses to retain counsel because he believes he is guilty and that nobody can help him?

Let us pass, for the moment, to the idea expressed by Drs. Raymond Brown and Gericke that one reason behind defendant's waiver may have been his innate belief that he was innocent, that truth would ultimately prevail and that the jury would therefore acquit. From these premises, we are to gather, the defendant assumed that he did not need counsel, for representation would be an idle act.

As a legal proposition, we cannot accept this line of reasoning. This is because no matter what defendant may have told the psychiatrists about his being innocent, this Court is bound by the finding of the jury that he *willfully* evaded income taxes. A man who willfully does acts which constitute a crime, a man who, we have found, understood the nature of the charges against him, is not a man who can honestly say that he knows he is innocent.

Whatever may have been defendant's real reasons for waiving counsel,[3] it is quite possible that the psychiatric re-

---

3. Of course, it is admittedly difficult to delve into a person's mind and determine what his "real" reason was for pursuing a given course of conduct. Aside from the reasons advanced by two of the psychiatrists, however, the Court should like to make its own suggestion. Defendant knew that since a unanimous verdict would be necessary to convict him, his chances of acquittal were favorable. He also knew that the transactions which the government would have to prove were extremely complicated and likely as not could not be traced by the Internal Revenue Service, must less by a jury of lay persons. Here, of course, defendant underestimated the perseverance of Mr. Martin Hoffenblum, Special Agent for Internal Revenue Service. When we refer to these complicated transactions, we are thinking of the confounding manipulations concerning the Reno Brewing Co. and those involved in the sale of 89,800 shares of the stock of Pacific Clay Products Co., a sale involving in excess of one million dollars. Even if he wanted to explain to an attorney the schemes which he used to hide income, we have grave doubts that most lawyers could gain a sufficient familiarity with what had transpired so as to be able effectively to combat the government's case. In fact, defendant knew more about the subject matter of the suit than even the government did. For example, despite intensive investigation, it was only in the course of Mr. Redfield's defense that the government was able to uncover one more of the often-used nominee accounts, that of Myra McCue. See Tr., vol. VI, pp.

1631, 1633, Tr., vol. VII, pp. 1656, 1712.
Is it too far-fetched to believe that, say, when it came time to cross-examine government witnesses, Mr. Redfield could not honestly believe he was more competent than an attorney?
Since, because of what we have just stated, defendant could believe that he had a reasonable chance of being acquitted, is it not possible that another thought crossed his mind, namely, that he could play upon the sympathy of the jury? After all, here would be a man, small in physical stature and unskilled in the technicalities of the law, facing a battery of highly competent government attorneys and agents. Under those circumstances he could say, as he did: "In my case I am interested only in the true facts of the case; the complete and thorough presentation of all facts concerning this case, and if that is presented I have no fear, no hesitancy as to what the judgment of this jury will be." Tr., vol. I., p. 146, lines 3-6. He could also say to the jury, as he did: "I, of course, am not an attorney. I know absolutely nothing about the law. * * * Those who know the law may have an advantage over me, in that they might know something to do or something to say— shall we say tricks of the trade * * *." Tr., vol. I, p. 145, lines 9-10, 17-19. He could accuse, as he did, the government of using "unsavory tactics," Tr., vol. VIII, p. 2012, lines 7-9, and he could raise the cry of "Gestapo tactics." Tr., vol. VIII, p. 2012, lines 24-25, p. 2013, lines 1-4. He could also insinuate that he was being "singled out for special

ports, especially those submitted by defendant, suffered from the fact that defendant was less than candid during his examinations. Dr. Richard Brown has stated: "One thing does stand out with this man; he is not revealing all that he knows." That, incidentally, was a characteristic revealed by defendant during the course of the inquiry by the Probation Officer as the latter was preparing his presentence report. In any event, the assertion that defendant was withholding from his examiners, an assertion which stands uncontradicted, casts grave doubts on the conclusions of Drs. Raymond Brown and Toller that defendant did not validly waive his right to counsel.

But, even taking these two reports at face value, something which we would not be required to do even if they went unchallenged, Blodgett v. United States, 8 Cir., 1947, 161 F.2d 47, 56, how can they be squared with the conclusion reached by this Court, at the time of the waiver, that defendant acted in a competent, rational and intelligent manner? The short of it is that they cannot.

■ Before proceeding further, however, this Court will observe that a careful reading of the numerous cases in this area indicates that the courts, in determining whether there has been a valid waiver, will consider the entire record of the case. Indicative of this approach is the statement appearing at page 464 of the opinion in Johnson v. Zerbst, supra, 304 U.S., at page 1023 of 58 S.Ct.: "The determination of whether there has been an intelligent waiver of the right to counsel must depend, in each case, upon the particular facts and circumstances

surrounding that case, including the background, experience, and conduct of the accused."

Perhaps it is because of this approach to the problem that the courts in the Kaplan and Cummings cases, supra, ruled that the waivers did meet the constitutional test, even though psychiatrists had opined to the contrary.

■ In line with the idea that the courts are to consider all relevant circumstances, we cite at least one case where the court took into account the fact that defendant was no stranger to the courts. See Williams v. Swope, 9 Cir., 1951, 186 F.2d 897, 898. Such factor is relevant because it shows that the defendant who has been in court before knows that a trial is a serious proceeding, that there are certain procedures which must be followed and that the managing of a case is within the peculiar competency of a member of the bar. A person who on numerous occasions has been a litigant cannot be said to be ignorant of the functions served by an attorney, and hence, when he waives his right to counsel, we can only assume that he did so with his eyes open, assuming as we do that the defendant knew he had a right to counsel. It is because of the insight which a person gains from litigating that we deem it irrelevant that his prior court experiences were civil in nature.

■ Although this Court was dimly aware of the fact that the defendant had been engaged in several law suits prior to the one here in question, it did not take into account then, as it does now, that defendant has had extensive court experience.[4] This Court takes judicial notice of the fact that defendant repre-

---

treatment." Tr., vol. VIII, p. 2013, lines 6–7.

In short, this Court is suggesting that perhaps defendant's decision to appear without counsel was a careful calculation, albeit an incorrect one as it turned out, by an undeniably shrewd man, who was well aware of his rights and knew exactly what he was doing.

4. In addition to the cases to which he was a party, defendant served as a member

of the federal grand jury for the District of Nevada from November 25, 1957 through April 23, 1959. That particular panel returned 24 indictments, ranging from Dyer Act violations to false representation as a citizen, and from narcotics violations to misapplication of bank funds. This experience must have contributed to defendant's knowledge that criminal prosecutions are not matters to be dealt with lightly.

sented himself in the case of Securities & Exchange Commission v. Redfield, United States District Court for the District of Massachusetts, Docket No. 55–68W (1955). For what it is worth, we note from a newspaper clipping dated February 16, 1955 that Judge Wyzanski inquired of Mr. Redfield whether he had funds sufficient to employ an attorney. Mr. Redfield responded in the affirmative, added that he did not need a lawyer, and the record shows that he continued to represent himself right up to the very time judgment was entered against him.

We also take judicial notice of the fact that defendant represented himself in the case of Guild v. Redfield, Second Judicial District Court of the State of Nevada, Docket No. 185,955 (1960). With respect to that case, we further note the affidavit of one of the plaintiffs, a member of the bar of this Court, that defendant there "appeared to be fully competent to represent himself."

Finally, we take judicial notice of the fact that Mr. Redfield appeared, either as plaintiff or defendant, in some sixteen additional actions, all of which were before the Second Judicial District Court of the State of Nevada, unless otherwise noted.[5]

We cite all of this not to indicate that defendant is not entitled to the full measure of his constitutional rights, but only to show that he was no stranger to courts and that such fact points to a conclusion that he knew exactly what he was doing when he waived his right to counsel.

 In conclusion, we note that it is settled law that the defendant "has the burden of showing, by a preponderance of the evidence, that he did not have counsel and did not competently and intelligently waive his constitutional right to the assistance of counsel." Moore v. Michigan, 1957, 355 U.S. 155, 161, 78 S.Ct. 191, 2 L.Ed.2d 167; Watts v. United States, 9 Cir., 1959, 273 F.2d 10, 11–12, certiorari denied 1960, 362 U.S. 982, 80 S.Ct. 1069, 4 L.Ed.2d 1017; O'Keith v. Johnston, 9 Cir., 1942, 129 F.2d 889, 890, certiorari denied 1942, 317 U.S. 680, 63 S.Ct. 161, 87 L.Ed. 546; c. f., Blood v. Hudspeth, 10 Cir., 1940, 113 F.2d 470, 471 (ordinarily it will be presumed that the waiver was valid); Kelly v. Aderhold, 10 Cir., 1940, 112 F.2d 118, 119 (same as Blood v. Hudspeth, supra). Upon a consideration of all the evidence—the psychiatric reports, the statements and conduct of defendant, his past experiences both in and out of court, and his demeanor—this Court finds that defendant has not met the burden of proof which the above-cited cases place upon him. Accordingly, we find as fact, Michener v. Johnston, 9 Cir., 1944, 141 F.2d 171, 175, that defendant waived his right to counsel in a competent, intelligent and understanding manner.

IV. Defendant was not Denied a Fair and Impartial Trial, nor were his Rights Under the Sixth Amendment Violated by Virtue of the Nature of His Defense.

The next major point is defendant's contention that he "was denied his constitutional right to a fair and impartial trial because defendant, acting as his own Counsel, was not capable of conducting his defense and the record of the trial in this cause establishes that defendant was so ignorant of law and procedure and his defense was so inadequate and

5. Steinheimer v. Redfield, Docket No. 54,-883 (1936); Washoe County v. Bushard, Docket No. 128,289 (1950); Bell Telephone Co. v. Bushard, Docket No. 131,-968 (1950); Redfield v. First National Bank, Docket No. 147,426 (1953); City of Reno v. Bushard, Docket No. 150,375 (1954); Lyons v. Redfield, Docket No. 150,763 (1954); Baker v. Boyd, Docket No. 151,296 (1954); Commercial Credit Corp. v. Mathews, Docket No. 160,234 (1956); State of Nevada v. Bushard, Docket No. 162,707 (1956); Reno Brewing Co. v. Redfield, Docket No. 163,756 (1956); Wantz v. Redfield, Docket No. 166,967 (1957); Redfield v. Chisholm, Docket No. 168,120 (1957); Redfield v. Peterson, Docket No. 175,558 (1958); A. L. Jameson & Co. v. Redfield, 1931, 118 Cal.App. 59, 4 P.2d 817; Redfield v. Barnhart-Morrow Consolidated, 1936, 16 Cal.App.2d 310, 60 P.2d 887; Dunbar v. Redfield, 1936, 7 Cal.2d 515, 61 P.2d 744.

**572**

incompetent that he has been deprived of his liberty in violation of his rights under the Sixth and Fourteenth Amendments to the Constitution of the United States." *Defendant's Memorandum of Points and Authorities,* p. 7.

Of course, defendant does not here allege that defendant was incompetent to stand trial. That much was settled at the hearing on March 3, 1961. What defendant is saying is that he was not capable of doing for himself that which we might reasonably expect of an attorney.

▉ Before going further, we pause to note that defendant's counsel show a lack of understanding of the law applicable to this case in that it is elementary that the Fourteenth Amendment has no bearing whatever on criminal prosecutions in the federal courts.

▉ We have already determined, it will be remembered, that defendant validly waived his right to counsel and that we could not force counsel upon him under those circumstances. Now, however, defendant tells us that his Sixth Amendment rights were impaired because he allegedly did a poor job of representing himself. This, in effect, is a contention that competency to waive counsel can only exist if the defendant is qualified to try a law suit. The case law does not even suggest such a possibility.[6] Indeed, the Supreme Court has held that when a lawyer-defendant waives counsel, the fact that he has had professional experience may be a factor in determining whether he actually waived his right to the assistance of counsel, "but it is by no means conclusive." Glasser v. United States, 1942, 315 U.S. 60, 70, 62 S.Ct. 457, 465, 86 L.Ed. 680. By negative inference, therefore, the fact that one is not an attorney should not be of any consuming concern.

▉ What, then, can be expected of this Court? Were we supposed to give defendant a course in the art of trying a law suit? To state the question is to state the answer. Were we supposed to coach him every step of the way, tell him what to ask of witnesses—in short, act as counsel for him? To do so would clearly have transcended the proper functions of the court. The Court of Appeals for the Ninth Circuit put it well when it stated:

"When appellant chose to proceed without counsel, he chose a course of action fraught with the danger that he would commit legal blunders. But having made that choice he did not thereby acquire the right to have the court act as his counsel whenever he seemed to be blundering. *It cannot be said that the court denied him representation of counsel, or denied him a fair trial, because the judge refrained from intermeddling.*" Burstein v. United States, 9 Cir., 1949, 178 F.2d 665, 670 (emphasis added).

Or, as the Court of Appeals for the Fifth Circuit has put it: "Once it is found, however, that such an accused has properly waived his right to counsel, the effects flowing from that decision must be accepted by him, together with the benefits which he presumably sought to obtain therefrom." Smith v. United States, 5 Cir., 1954, 216 F.2d 724, 727. See also, Michener v. United States, 8 Cir., 1950, 181 F.2d 911, 918 ("If an accused were represented by counsel, it most obviously is not the duty nor the privilege of the judge to suggest or explain possible defenses in behalf of the accused. And upon finding a competent, intelligent and intentional waiver of counsel, it is not then any the more the duty of the trial judge to advise an accused respecting possible defenses.").

Notwithstanding what we have just said, however, the Court did, on numerous occasions, give advice to defendant

---

6. As a matter of fact, the language which we have quoted *infra* from our Circuit's opinion in the Burstein case indicates that lack of skill in representing oneself has nothing at all to do with rights under the Sixth Amendment.

or otherwise help him to defend himself.[7] Moreover, as our Circuit commented in another case, "the manner in which he handled himself, show[s] that although his ideas of a defense were extraordinarily unorthodox, he was alert and intelligent." Burstein v. United States, supra, 178 F.2d at page 670.[8]

7. We cite the following only as some of the relevant examples. No attempt has been made to exhaust the transcript.

The Court carefully explained to defendant the nature of the two types of challenges to the jury during the process of impanelling, how many challenges were allowed to the various parties and the procedure to follow. Tr., vol. I, p. 41, lines 15–23; p. 62, line 25—p. 63, line 2; p. 66, lines 5–15; p. 66, line 21—p. 67, line 17; p. 69, lines 11–23; p. 78, line 3—p. 79, line 8.

The Court explained the rule excluding witnesses from the courtroom until they are called to testify. Tr., vol. I, p. 130, lines 11–25.

The Court cautioned defendant to scrutinize offers of documentary evidence before he stipulated to their admission, and advised defendant to assert his right even "if the Court gets a little fast." Tr., vol. I, p. 154, line 19—p. 155, line 1.

The Court explained the scope of proper cross-examination. Tr., vol. III, p. 633, lines 12–20.

The Court suggested the proper form of questions. Tr., vol. III, p. 635, lines 4–24; p. 787, lines 9–12; and Tr., vol. V, p. 1380, lines 22–24; p. 1382, lines 1–2.

By way of direct assistance to defendant, the Court let down the ordinary rules of evidence and procedure by allowing defendant, during his cross-examination of government witnesses, to elicit direct evidence as to his reputation. Tr., vol. III, p. 633, line 7—p. 634, line 9; and Tr., vol. V, p. 1285, lines 3–16. The Court allowed certain of defendant's questions to stand, even though they were improper. Tr., vol. IV, p. 892, lines 11–18; p. 1112, lines 6–14. The Court even asked defendant certain questions during the latter's cross-examination of a government witness, with the result that defendant was enabled to bring out facts that would always have to be brought out during his own case in chief. Tr., vol. IV, p. 870, line 7—p. 871, line 23.

Defendant will not deny that during the earlier-mentioned conferences between defendant and the Court, all of which were held in chambers, the Court carefully advised defendant of his rights and the procedure to be followed in connection with his demand for a bill of particulars.

Finally, as we shall point out later in this opinion, the Court fully and carefully explained to defendant the proper scope and subject matter of a closing argument.

8. By way of partial example only, and without attempting to exhaust the record, we would note the following:

The defendant was sufficiently alert to make objections to proffers of testimony or documents. See, for example: Tr., vol. I, p. 188, line 9—p. 191, line 7 (tax returns outside of indictment years); Tr., vol. I, p. 193, lines 1–8 (same); Tr., vol. I, pp. 194–95 (photostatic copies of documents); Tr., vol. II, p. 347, lines 3–4 ("you are putting words in the witness' mouth * * *."); Tr., vol. III, p. 616, lines 6–24 (deposit slips outside of indictment years); Tr., vol. III, p. 624, lines 24–25 (ledger sheets outside of indictment years); Tr., vol. III, p. 644, lines 11–12 (document remote in time); Tr., vol. III, p. 677, lines 18–20 (checks outside of indictment years); Tr., vol. III, p. 687, lines 13–14 (same); Tr., vol. IV, p. 846, line 14—p. 847, line 1 ("Your honor, yesterday just before adjoining for the noon recess, I was handed what is called a supplemental bill of particulars by counsel for the plaintiff, and upon what search I made I find that where a pretrial bill of particulars has been rendered, which was done on September the 10th, the Government's proof is measured and limited by the statements made in said bill of particulars, and it is not permitted that they can be amended of [by?] a supplemental bill of particulars brought in during the course of trial, and I have here a notation of points and authorities in support of that contention."); Tr., vol. IV, p. 900, lines 10–11 ("Objected to, your Honor, on the basis that it calls for a conclusion of the witness."); Tr., vol. IV, p. 993, lines 5–10, 23–24 (testimony as to subject matter not included in bill of particulars); Tr., vol. V, p. 1192, lines 13–14 and p. 1193, lines 2–6 (testimony of witness in toto); Tr., vol. V, p. 1225, lines 12–16 (tax return outside of indictment years); Tr., vol. V, p. 1240, lines 3–5 (best evidence rule); Tr., vol. V, p. 1241, lines 6–8 ("These likewise are objected to on the basis that they are not the best evidence, that the originals are the best evidence.")

Though defendant may be technically correct in saying that he "did not register twenty objections during the entire four-week trial", the statement misses the point. This is because counsel fails to

The case cited by defendant, Lunce v. Overlade, 7 Cir., 1957, 244 F.2d 108, 74 A.L.R.2d 1384, is inapposite because that case was only concerned with the inadequate representation of a defendant by somebody, an attorney, other than him-

point out, even at this time, those proffers of evidence which were subject to objection. Furthermore, the objections which defendant did make suggest that he was alert and ever conscious to preserve his rights.

We cannot take too seriously defendant's statement that he "had no idea how to conduct a cross-examination of an adverse witness." Although he may have not revealed the skill or glibness of television's Perry Mason, the record shows that he had an excellent grasp of the facts in question and that he was alert to bring out any information possessed by the witness which would help his own case. See, for example, his cross-examination of Harold S. Chisholm, Tr., vol. III, pp. 784–804; of William Rollo, Tr., vol. III, pp. 809–10 (wherein defendant carefully attempted to set the stage for a claim that the Oregon-Nevada Lumber Co. was nothing other than a dummy corporation); of Richard M. Hughes, Tr., vol. III, pp. 814–15 (same); of Roland N. Dohr, Tr., vol. III, pp. 827–30 (wherein defendant elicited testimony that profits made by him, allegedly on behalf of Reno Brewing Co., were received by said firm); of Tung S. Fong, Tr., vol. V, pp. 1157–1159 (wherein defendant brought out that with respect to the nominee account there in question he ·had never been requested to pay dividends to the nominee); of Sarah E. Dolan, Tr., vol. V, pp. 1173–74 (wherein defendant was able to get into the record that this particular nominee never had any occasion to doubt the manner in which he was handling her account and that he was a most generous man); of Harry M. Green, Tr., vol. V, pp. 1244–47, 1248 (wherein defendant was able to get an Internal Revenue Agent to admit that he had no personal knowledge that the interest payments there in question were ever made to defendant); of Mona Riepen, Tr., vol. V, pp. 1280–83 (wherein defendant elicited from this nominee-account witness that he did pay to her certain profits from the account carried in her name); of Willard D. Snow, Tr., vol. V., pp. 1302–09 (wherein defendant brought out that the witness did not know in whose name the particular stock there in question was held nor who received the proceeds from the sale of same). One familiar with all the evidence in the trial can see that defendant was quick to point out inaccuracies in the direct testimony of the government witnesses and, as we shall observe

later in this opinion, he was seldom prone to pass up the opportunity to argue with the witnesses or, if that technique failed, to testify himself.

Defendant would further have us find great significance in that he offered to stipulate into evidence all documents which the government possessed relevant to the indictment years. Frankly, we are not at all sure that defendant was serious and that this was not a grand stand play to the jury in that it was an attempt by him to put the government in the unfavorable light of having to produce witnesses from all parts of the country, at great expense to the taxpayers, merely in its attempt to oppress defendant. See Tr., vol. II, p. 312, line 25—p. 313, line 16.

We say this because, as we observed in our opinion and order of December 29, 1960 (which order denied defendant's motion to review taxation of costs), "the timeliness of defendant's offer is subject to question. Although he had examined the bulk, if not all, of the government's documentary evidence prior to trial, defendant made no offer to stipulate at that time." Then, too, bearing in mind that defendant was aware of the nature. and identity of the documentary evidence to be used against him, how can counsel indicate that the offer to stipulate was indicative of stupidity when we have not been cited to any document, other than those objected to by defendant at trial, which should not have been admitted? Finally, this Court saved defendant from himself, as it were, when it refused to coerce the government to accept the offer to stipulate. Tr., vol. II, p. 313, line 17—p. 315, line 8.

The defendant next asserts that the instructions offered by him were wholly inadequate and that he did not object to instructions offered by the government. To begin with, the proffered instructions indicate that either defendant has legal ability far beyond that of the average layman, or else that counsel retained by him for that special purpose did not do him justice. We say this because the instructions were submitted in the style prescribed by the Local Rules of this Court and complete to the point of bearing citations to cases. With respect to the lack of objection to the government's proposals, we note that they were, in the main, accurate statements of the law, but that in the interest of doing justice to the defendant this Court la-

self. In that case, Lunce could find fault with an attorney; here, defendant can only find fault with himself.[9] In any event, the Lunce case states a minority proposition, as is evidenced by a reading of the following cases: Ex parte Haumesch, 9 Cir., 1936, 82 F.2d 558, 558–559 (the defendant, "having been represented at the trial of his case * * * by an attorney of his own selection, cannot complain that he has been deprived of his constitutional right to be represented by counsel because the attorney so selected was, as he claims, unskilled or incompetent in the handling of the case."); Gambill v. United States, 6 Cir., 1960, 276 F.2d 180, 181 ("A defendant cannot seemingly acquiesce in his attorney's defense and after the trial has resulted adversely to him obtain a new trial because of the incompetency of his attorney."); United States v. Hack, 7 Cir., 1953, 205 F.2d 723, 727, certiorari denied 1953, 346 U.S. 875, 74 S.Ct. 127, 98 L.Ed. 383; United States ex rel. Darcy v. Handy, 3 Cir., 1953, 203 F.2d 407, 426, certiorari denied sub. nom. Maroney v. United States ex rel. Darcy, 1953, 346 U.S. 865, 74 S.Ct. 103, 98 L.Ed. 375; Burton v. United States, 1945, 80 U.S.App.D.C. 208, 151 F.2d 17, 18–19, certiorari denied 1945, 326 U.S. 789, 66 S.Ct. 473, 90 L.Ed. 479; Tompsett v. State of Ohio, 6 Cir., 1944, 146 F.2d 95, 98, certiorari denied 1944, 324 U.S. 869, 65 S.Ct. 916, 89 L.Ed.

1424; United States v. Malfetti, D.C.D. N.J.1954, 125 F.Supp. 27, 29.

 Defendant has hit upon quite a scheme: waive counsel, take your chances with the jury, then if the jury disappoints you, merely point out that you are a poor substitute for a lawyer, thereby gaining another trial with the concomitant chance that you will find the one juror who will keep you from paying the penalty which the law exacts. If such a maneuver were allowed "there would seldom, if ever, be a final termination of criminal charges." See United States v. Hack, supra, 205 F.2d at page 727. Some court other than this one will have to sanction such a subterfuge.

V. The Defendant was not Denied a Fair Trial by Virtue of Comments of the Court or Government Counsel.

A. Allegedly prejudicial comments of the Court.

 The defendant has gone to great lengths to cite those portions of the transcript which, he asserts, show that the Court, by its comments, prejudiced the defendant in the eyes of the jury. Before considering the specific items in question, we would only note that there never was, at any time, an intent on the part of the Court to do anything which would be calculated to harm the defendant. As this opinion has indicated already, and as we shall demonstrate shortly, the Court

bored long and hard to scrutinize carefully and to edit or to rewrite any of the government's instructions which did not give defendant his due. Finally, we would note that the true test of defendant's intelligence and alertness is whether he objected to the instructions which were ultimately proposed by this Court. In all humility we say that he could not, for the final instructions were, as we said earlier, a complete, fair and, accurate statement of the applicable law.

Finally, this Court was able to observe the many other ways in which defendant demonstrated his intelligence and alertness. Whether we consider important matters such as his demand for a bill of particulars or relatively unimportant ones such as calling attention to the fact that a given document was

dated incorrectly, Tr., vol. I, p. 253, line 25—p. 254, line 11, and calling to the attention of government counsel the correct number of an exhibit, Tr., vol. IV, p. 1109, lines 18–22, the record shows that the defendant was constantly alert to protect his rights.

9. The Lunce case is further distinguishable in that counsel there was not retained until the very day of the trial, 244 F.2d at page 109; he represented that defendant without any preparation, 244 F.2d at page 110; and he cannot be said to have been the choice of that defendant, since the trial date was at hand, the defendant had no counsel and the allegedly incompetent attorney volunteered at the very last minute. 244 F.2d at page 109.

bent over backwards to see to it that the defendant received a fair trial.

■ First of all, a reading of the transcript will show that many of the allegedly improper comments of the Court were made in an attempt to remind the defendant that while examining a witness or arguing to the jury, he was acting in the capacity of an attorney. Time and time again, however, the defendant insisted on making remarks from the counsel table which, under no stretch of the imagination, could be regarded as being anything other than pure testimony on his part or, alternatively, as blatant arguing with the witness.[10]

10. The parenthetical notation at the beginning of each of the following paragraphs refers to the page and line of defendant's memorandum which cites allegedly improper comment of the Court. We shall deal with each such citation briefly.

A. (Page 14, lines 10, 11). The witness in question had twice stated that defendant had offered to make the loan in question. Tr., vol. III, p. 792, lines 21, 24. When defendant under the guise of cross-examination, stated: "Well, you know very well I didn't offer * * *" Tr. vol. III, p. 792, line 25, the Court properly concluded that the defendant was being argumentative. Tr., vol. III, p. 793, line 1. Defendant proceeded, without hesitation, to ask: "It was you who sought the loan?" He would characterize this only as being a leading question. We believed then, and say now, that in view of the fact the witness had answered the question twice, the defendant was being argumentative, and hence it was proper for the Court to interrupt him.

B. (Page 14, line 14). Defendant, by referring to remarks out of context, attempts to make it appear that the Court was interrupting the defendant as soon as he started questioning a witness. The transcript, when read in context, shows that the defendant had just argued with the witness, Tr., vol. III, p. 795, lines 20–21, and that the Court was trying to explain that he must follow proper procedure. In the midst of the Court's comment, later resumed, the defendant simply began his questioning again. Tr., vol. III, p. 796, line 6.

C. (Page 14, lines 15, 16). These two comments merely drew the defendant's attention to the fact that all along he had been testifying under the guise of cross-examination, a fact which is borne out by the transcript of this particular witness' testimony. Tr., vol. IV, p. 872, lines 5–9; p. 873, lines 3–7; p. 874, lines 16–17; p. 875, lines 1–15.

D. (Page 14, lines 27, 28). The defendant was, again, testifying; hence, the Court's comments were perfectly proper.

E. (Page 14, line 29). The Court's comment referred to the following statement of defendant after the witness' answer: "Plus the cost of the property." Although the transcript shows that a question mark followed the quoted words, the Court's remark in question clearly shows that the Court interpreted defendant's words to be a statement of fact, rather than a question. This assignment of error points up the danger of trying to gain knowledge, as to the way things are spoken, from the cold, printed record. Once the Court had determined that the defendant was again testifying, it was perfectly proper to go on to remark that the defendant's statement should be stricken.

F. (Page 14, lines 31, 32). The defendant was in the process of cross-examination. His purported questions were obviously attempts to testify. Under the circumstances, the Court's cautions were proper.

G. (Page 15, line 1). Another example of defendant's testifying. Here, he explains that he merely wanted to "refresh her memory as to what [the] agreement was" between the witness and defendant. But, as the Court pointed out, the witness had already explained that. See, Tr., vol. V, p. 1211, lines 7–10.

H. (Page 15, line 2). The defendant had laid absolutely no foundation upon which to base a question as to the witness' knowledge of the event in question. Under the circumstances, the remarks of defendant were simple testimony.

I. (Page 15, lines 3, 4). Both of defendant's questions amounted to testimony and, in any event, at least the second question, at Tr., vol. V, p. 1282, lines 10–12, called for an opinion which the witness could not possibly give. See the witness' own disclaimer of knowledge at Tr., vol. V, p. 1281, lines 18–20.

J. (Page 15, line 8). Defendant's statement "in fact, I had quit financing Morvay" is clearly an attempt to testify.

K. (Page 15, line 14). Defendant had asked the witness whether certain statements were contradictory. The question, as phrased by defendant, indicates that the witness made the contradictory statements, whereas the record, Tr., vol. V, p. 1389, line 24—p. 1390, line 2, shows that the statements were made by defendant

It was, of course, entirely proper for the Court to caution or to reprimand the defendant lest he continue to lapse from the role of counsel into that of witness. See Shelton v. United States, 5 Cir., 1953, 205 F.2d 806, 810, certiorari dismissed 1953, 346 U.S. 892, 74 S.Ct. 230, 98 L.Ed. 395. The defendant objects that the Court found it necessary to remind the defendant that if he desired to testify that he should take the witness stand.

to the witness. Right after the witness agreed that the statements were contradictory, defendant attempted to explain matter which is not apparent from the record, but which under any circumstances must be classified as testimony or argument. The Court then merely advised defendant as to when it would be proper to contradict the witness.

L. (Page 15, line 16). The witness had just finished giving his version of the nature of a complicated transaction. As soon as he was finished, the defendant asserted: "No, that was not the agreement." Tr., vol. VI, p. 1559, line 15. Under the circumstances, it was appropriate again to advise defendant of the proper manner to contradict witnesses.

M. (Page 15, line 18). The five-line "question", Tr., vol. VI, p. 1560, lines 17–21, was nothing other than testimony or argument, in which case it was proper for the Court to inquire of defendant whether he was arguing or questioning, and in any event, to remind him that he should ask a question.

N. (Page 15, line 19). The 11-line "question", Tr., vol. VI, p. 1562, lines 3–13, was nothing other than testimony or argument, in which case it was proper for the Court to advise defendant that it did not constitute cross-examination. The second question, eight lines long, Tr., vol. VI, lines 17–24, was part testimony, and in any event, so confusing that it was necessary, for the witness' understanding, for the defendant to break it down, as the Court directed.

O. (Page 15, line 20). The example used by defendant in his question was legitimate. But, when defendant concluded in his question, "Now, there is a tax saving * * *," that is sheer testimony. Tr., vol. VI, p. 1563, line 9.

P. (Page 15, lines 22, 23). The witness had stated, Tr., vol. VI, p. 1565, line 12, that defendant had made an additional loan to a third party. The defendant soon thereafter went on to "ask" whether the witness recalled that the defendant

This argument is adequately and appropriately answered by the following observation by the Court of Appeals for the Fifth Circuit:

"The trial court would not conceivably have tolerated the self-serving statements made by the accused and his flat denials of statements made by witnesses, and his irrelevant comments, if made by a lawyer. In fact, the criticism now levelled at the

refused to make an additional loan, but was willing to buy the properties in question for a specific sum of money, and then give the third party the difference between the value of the original loan and the purchase price of the properties. Tr., vol. VI, p. 1566, lines 18–22. The Court cautioned defendant, but with complete disregard for what the Court had just said, the defendant continued: "Do you remember *that*?" Tr., vol. VI, p. 1566, line 25.

Q. (Page 15, line 24). The witness had testified that a third party had *gone* to defendant to borrow, Tr., vol. VI, p. 1569, lines 1–2, whereupon the defendant gratuitously commented: "They *did* borrow additional funds." Tr., vol. VI, p. 1569, line 3. The Court again advised defendant that he was testifying.

R. (Page 16, line 3). The defendant had been attempting to push the witness into saying that there would be "double-taxation" if the defendant had been required to pay certain taxes. On three occasions the witness testified that no "double tax" was involved. See Tr., vol. VII, p. 1743, lines 10–14; p. 1750, lines 1–2, 23–24. The defendant proceeded to argue with the witness, who had just stated that the corporation in question had not paid a tax, by asserting: "Because no tax was due." Tr., vol. VII, p. 1751, line 12. The allegedly objectionable colloquy between Court and defendant was merely an attempt to ascertain whether or not the defendant intended to examine or to testify.

S. (Page 16, line 19). The defendant attempted to relate a conversation which had taken place outside of the courtroom. A check of the transcript shows that the particular conversation had never been testified to by the witness. But, defendant was not deterred, because immediately after the Court had cautioned him, he proceeded to relate more of the conversation. Tr., vol. VII, p. 2014, line 25 —p. 2015, line 2.

trial court for referring to the right of the accused to testify in his own behalf arose entirely from the court's patient explanation, repeatedly made to Smith as he purported to cross examine government witnesses, that he could not argue with them or dispute them, as he repeatedly did, but that if he wanted to get his views to the jury he ought to take the witness stand. There is no merit in the contention that the court prejudiced appellant by any of such statements or by all of them taken together." Smith v. United States, 5 Cir., 1956, 234 F.2d 385, 388–389.

 Secondly, despite the great number of cautions by the Court, the defendant often was not satisfied with merely arguing with the witnesses. He saw fit on several occasions to comment on the credibility of the witnesses during the course of his examination,[11] a tactic

11. The parenthetical notation at the beginning of each of the following paragraphs refers to the page and line of defendant's memorandum which cites allegedly improper comment of the Court. We shall deal with each such citation briefly.

A. (Page 15, lines 9, 10). On three different occasions the defendant had commented on the credibility of the witness in question. Tr., vol. V, p. 1379, line 11 ("Well, you have proved yourself an astute man."). The Court ordered the remark stricken. The defendant, without hesitation, proceeded to say: "Well, you have proved very clever in * * *." Tr., vol. V, p. 1379, line 16. The same order was given, whereupon the defendant commented: "It seems that the witness should be able to remember as to—his memory has been good as to most subjects, and it seems that he should be able to remember as to the time. * * *" Tr., vol. V, p. 1379, lines 18–21.

B. (Page 15, line 11). The defendant asked the witness whether he had failed to accede to the defendant's request for an itemization. Tr., vol. V, p. 1383, lines 5–6. The Court observed that "there is nothing in the record that you made a request for an itemization. The witness has stated you didn't." This comment was well warranted by the testimony. See Tr., vol. V, p. 1381, line 18—p. 1382, line 9. Almost immediately thereafter, the witness stated: "I don't recall any conversation with you in which you made such a request." Tr., vol. V, p. 1383, lines 16–17. In response to that statement, the defendant observed: "Your memory seems very good * * *." Tr., vol. V, p. 1383, line 18. The Court proceeded to caution defendant not to make remarks concerning credibility. The defendant, with an innocence reserved only to angels retorted: "I am simply trying to bring out the complete and true facts." Tr., vol. V, p. 1384, lines 5–6. The Court then cautioned: "You do it according to the rules of procedure and evidence. Just because you want to be your own attorney, that doesn't mean that the bars of procedure are down and you can conduct this like you would a Piute pow-wow." On seven previous occasions the defendant had commented on credibility. See Tr., vol. III, p. 784, lines 14–15 ("Your Honor, I have never heard such a portrayal * * *."); vol. IV, p. 988, lines 13–17 ("and then gets on the stand and testifies as he did, which he knows to be just the reverse of the truth."); vol. IV, p. 988, lines 20–21 ("When he perjures himself that way, I think * * *."); vol. V, p. 1379, lines 11, 16, 18–21, and p. 1383, line 18. These circumstances explain why the Court felt a strong admonition was appropriate. As to the reference to a Piute pow-wow, we would only note that the expression is a colloquialism common to citizens of this State, and that it has, and was only intended by the Court to have, reference to an informal and not too well organized method of conducting important business. It is similar to referring to that type of gathering which is characteristic of a town meeting, a symbolism which this Court used on another occasion. Tr., vol. VII, p. 1676, lines 13–18.

C. (Page 15, lines 30, 31). The witness in question had just testified that the money from certain accounts had all gone either to the defendant directly or to one of his various accounts. The defendant observed: "That is not a true picture." Tr., vol. VII, p. 1690, line 21. In light of prior admonitions, the defendant must be assumed to have realized that he was acting wholly outside his role as attorney.

D. (Page 16, lines 20, 21). Here, the defendant stated in his argument that he had not received any interest payments from the witness in question. Tr., vol. VIII, p. 2016, line 21. The fact is that the witness had testified exactly to the contrary. See Tr., vol. V, p. 1201, line 13—p. 1202, line 8; p. 1208, lines 9–11.

which no court need tolerate. Upon the occasions cited in paragraphs A and C in footnote number 11, the Court found it necessary to threaten to hold defendant in contempt. By the time the trial had reached those respective stages, the defendant had repeatedly violated the cautions, admonitions and directions of the Court, not only with respect to the making of disparaging remarks about the testimony of various witnesses, but also by testifying and arguing under the guise of cross-examination and by asking improper questions. The defendant is an intelligent man, and so it occurred to the Court then, as it does now, that defendant's conduct, in the face of the scores of warnings given by the Court, may well have been a deliberate attempt on the part of defendant either to make a play for the undeserved sympathy of the jury, or to antagonize the Court to the point where it would be pushed into making unjudicious comments. The Court was determined to relieve defendant of his misconceptions; there would be respect for the Court. Hence, in the only language that the Court felt that the defendant would understand, the Court

threatened to hold defendant in contempt and advised him that had he been an attorney he already would have been so adjudged and sentenced.[12]

We shall have occasion later to comment generally upon the alleged prejudice of the Court, but, in the meantime, we are of the firm opinion that, under the circumstances, it was entirely proper for the Court to speak as it did. See Abbott v. United States, 5 Cir., 1956, 239 F.2d 310, 315 (even imposing a fine in the presence of the jury is warranted); People v. Knocke, 1928, 94 Cal.App. 55, 270 P. 468, 471 (Because of the repetition of the offense, the appellate court sanctioned the following remark of the trial court to the defendant: "If there is any more of that kind of talk, you will be in jail over Saturday and Sunday for contempt of court.").

The third category into which the assignments of alleged error fall relate to those incidents when the defendant asked a question in an improper manner—improper either because it asked for an opinion the witness was wholly unqualified to give, or because the question was confusing.[13] It needs no citation of au-

The defendant was not satisfied, so he attempted to contradict her. Tr., vol. VIII, p. 2016, lines 21–24. The Court merely tried to point out that the defendant would not be allowed to do so. However, since the defendant had seen fit to use his argument to impeach the witness, the Court thought then, and states now, that it was proper to caution the jury that, as far as the law was concerned, the witness' testimony stood unimpeached. Tr., vol. VIII, p. 2016, lines 7–10.

12. In addition to the instances already referred to, there was one other time when the Court alluded to contempt. At that time the defendant saw fit to testify in the form of a five-line "question." Tr., vol. VII, p. 1693, lines 4–9. The government objected, but the Court allowed the question to stand. This, of course, was out of the desperation induced by the defendant's consistent attempt to testify from the counsel table. However, the Court was disinclined to allow defendant to make a complete shambles of the rules of court, hence remarked: "Don't take that as an invita-

tion, Mr. Redfield, because the Court will do what it promised if you aren't careful. I have reached the end of my patience." In light of all that had transpired previously, the Court felt then, and holds now, that the comment was fully justified.

13. The parenthetical notation at the beginning of each of the following paragraphs refers to the page and line of defendant's memorandum which cites allegedly improper comment of the Court. We shall deal with each citation briefly.
 A. (Page 14, lines 25, 26; p. 15, line 5). The defendant's question obviously called for an opinion well beyond the competency of the witnesses in question. In any event, the questions were asked during cross-examination, where it is elementary that the examiner cannot go into reputation. Finally, the questions, going as they did to reputation, were objectionable because of improper form.
 B. (Page 14, line 30). The defendant had asked a question as to his reputation in improper form. The Court merely stated that the question was objectionable and the reasons why. The Court allowed the question to stand, however, and

thority for this Court to observe that such questions are not permitted. Accordingly, it was proper for the Court to caution the defendant.

The fourth problem deals with that portion of defendant's argument which related to the alleged burglary of his home. It began when, after "testifying" in his argument that he had made more money in 1932 than at any other time in his life, he stated: "During the noon hour of February 29, 1952, my home was burglarized." Tr., vol. VIII, p. 1973, lines 18–19.

Immediately government counsel objected: "If the Court please, I do not believe that the remarks of counsel [quoted

above] are in evidence. I feel that he is going far afield from drawing any inferences from the evidence, but, rather, at this time is testifying." Tr., vol. VIII, p. 1973, lines 20–23.

As we were advised by defendant's February 21, 1961 memorandum in support of the instant motion, there had been two references to the burglary by witnesses.[14] Under the circumstances, however, it was quite understandable that government counsel, the Court and, we assume, the defendant had overlooked them.[15]

In all of the colloquy between the Court and the defendant following the government's objection, never once did the de-

after the witness stated his answer, the Court merely asked the witness how he came by the information which he had related. This, of course, was proper since defendant had failed to lay a proper foundation.

C. (Page 15, line 12). The first question, Tr., vol. V, p. 1386, lines 1–5, was thoroughly unintelligible, hence the Court merely asked the defendant to make it more succinct. The second question, Tr., vol. V, p. 1386, lines 12–17, clearly asked the witness for an opinion he was not competent to give. The Court inquired whether a proper foundation had been laid. That one had not been laid becomes all the more clear when the witness later testified that he was not an expert on income tax law. Tr., vol. V, p. 1387, lines 3–5.

D. (Page 15, line 13). The question was clearly an attempt to ask the witness for an opinion which he could not possibly have given. Tr., vol. V, p. 1390, lines 5–6. The defendant then asserted that the witness had made a given statement. Tr., vol. V, p. 1390, lines 13–14. The Court quite properly observed that the witness had made an exactly contrary statement, which appears at Tr., vol. V, p. 1389, lines 17–20. Under the circumstances, the reprimand of defendant would seem fitting and proper.

E. (Page 15, line 21). The question was difficult to understand in that it compounded two distinct thoughts. Tr., vol. VI, p. 1563, line 22—p. 1564, line 1. The Court merely inquired of the witness whether he understood, something undeniably proper.

14. Mr. Hogan stated in passing: "* * * he told us, that there had been a rob-

bery that had taken place, and some of our dividend checks were alleged to have been stolen in the robbery." Tr., vol. IV, p. 1027, lines 13–16.

Mr. Hoffenblum had been asked whether he had found any indication that securities were sold by defendant during 1958. He responded that about $45,000 worth had been sold at a cost of about $30,000. The government counsel then asked: "All right. Will you continue?" Tr., vol. V, p. 1364, lines 16–21. The witness then explained part of the Reno Brewing Co. transaction and why defendant had not reported certain Canadian dividends. Tr., vol. V, p. 1364, line 22—p. 1365, line 17. He then went on to say: "He stated that he had complete records of all his transactions dating back to 1952, at which time his home was robbed and he said that his records were taken at that time during the robbery. That was the gist of the conversation." Tr., vol. V, p. 1365, lines 18–21.

15. That the references by the witnesses went unnoticed likely is explained by the following facts. 1) Both were passing and hearsay in character, and were not responsive to the questions asked by examining counsel. 2) Nothing was made of them at the time either by the government or by the defendant in his cross-examination. 3) The trial had been a long one—the better part of four weeks long. 4) The government had brought to the witness stand some 89 witnesses, and the defendant had produced 10 in addition. 5) The testimony alone covered some 1,713 pages of transcript. 6) The Hogan statement was made on October 13, the Hoffenblum statement was made

fendant, in precise and intelligible terms, call the Court's attention to the fact that there had been references in the testimony upon which to base his remarks. His failure to correct the Court, so that it might at that time have taken preventative steps, was, we feel, a waiver of the alleged error, if any. See MacInnis v. United States, 9 Cir., 1951, 191 F.2d 157, 159, certiorari denied 1952, 342 U.S. 953, 72 S.Ct. 628, 96 L.Ed. 708; United States v. Vasen, 7 Cir., 1955, 222 F.2d 3, 6, certiorari denied 1955, 350 U.S. 834, 76 S.Ct. 70, 100 L.Ed. 744; Smith v. United States, 5 Cir., 1954, 216 F.2d 724, 727.

In any event, we feel that there was no error in the first instance. This is because, even assuming that at the time of the incident the Court had been aware of the prior testimony, the defendant could not, under the circumstances, properly have stated more in his argument than he did.

The defendant did observe, during his argument, that his home had been burglarized, Tr., vol. VIII, p. 1973, lines 18–19; p. 2001, lines 23–24, and that "my records were lost to me." Tr., vol. VIII, p. 2001, lines 23–24, p. 2002, line 5. Bearing in mind the exact nature of the hearsay comments of the two witnesses in question, one familiar with this trial and the issues and evidence therein would have to conclude that what the defendant likely would desire to argue would be that the jury should draw the inference that the facts of burglary and the stealing of

certain records accounted for his misstatement of the cost basis of the securities which he sold and which were the subject of the indictment.[16]

But in no event could defendant be allowed to argue in that manner. This is because if, in fact there had been a burglary, it would not be material to the case, unless there was proof that the burglary resulted in loss of records which pertained to the stock transactions under inquiry. 1) There was no evidence whatever as to whether all his records, if any, were stolen, or part of them only. 2) There was absolutely no evidence that the records which allegedly were stolen related to the particular stock transactions in question. 3) The defendant had failed to show by testimony or otherwise that he had ever kept a record concerning the particular stock transactions which were the subject of the indictment. 4) The defendant had never introduced evidence to show that he had ever made a good-faith attempt to learn of the price at which he had purchased the securities in question. Because of the glaring lack of vital evidence, the jury could never be allowed to infer that the burglary and the stealing of certain records, if any, accounted for his mis-statement of the cost basis. Accordingly, the defendant would never be permitted, under the circumstances of the record, to so argue.

Fifthly, the defendant cites us to miscellaneous colloquies between the Court and defendant. As the notation in the margin shows,[17] these comments were

---

on October 18, but the defendant's argument was not until October 27.

This Court is of the opinion that the foregoing facts demonstrate how easy it was to overlook the references to the burglary and that, at the same time, they dispel the insinuation of the defendant that the Court engaged in a calculated attempt to deprive the defendant of his due.

16. Our assumption is supported by the following remonstrance made by the defendant during the course of colloquy between the Court and the defendant at the time of defendant's argument to the jury: "Well, the counsel for the plaintiff has made a point, or tried to make a

point, that I had not showed [sic] exact costs in some instances of securities sold." Tr., vol. VIII, p. 1978, lines 13–15.

17. The parenthetical notation at the beginning of each of the following paragraphs refers to the page and line of defendant's memorandum which cites allegedly improper comment of the Court. We shall deal with each such citation briefly.

A. (Page 15, line 8; page 8, lines 10–18). At the beginning of his opening statement to the jury, the defendant stated: "I, of course, am not an attorney. I know absolutely nothing about the law." Tr., vol. I, p. 145, lines 9–10. He went on to observe: "Yes, and I don't feel

harmless, when read in context, and in any event, were nothing other than an attempt by the Court to induce the defendant to observe proper courtroom decorum.

Finally, the defendant asserts the related points that, on the one hand, the Court "continuously interrupted and belittled" the defendant "even though no objection had been interposed by two

that I need to know the law. Those who know the law may have an advantage over me, in that they might know something to do or something to say—shall we say tricks of the trade, that might * * *." Tr., vol. I, p. 145, lines 16–19. Later on, while cross-examining a government witness, he apparently did not like the witness' answer that he, the witness, had paid a certain tax. So, he said: "That stops me, your Honor. That stumps me. * * * I paid it." Tr., vol. III, p. 798, lines 7–21. Both instances, as they appeared in the context of the trial setting, were nothing other than attempts on the part of defendant to gain undeserved sympathy of the jury. The Court felt that it was necessary to set the record straight, as it were, so that the jury would not fear that defendant's lack of representation by counsel would result in his getting an unfair trial. After all, the defendant had determined to appear *pro se*. Since the decision was a voluntary one on his part, there was no reason to permit him to make a play for the jury. He was doing just that when, with his hands in the air and a look of chagrin on his face, he allowed as how he did not know how to handle the situation brought about by the witness' unfavorable answer. The Court's comment "I don't propose to have you impose on the jury by standing there hour after hour indicating how stupid you are or at what a loss you are at defending your own case. You had the right to have counsel. Now you chose not to have. Having chosen to represent yourself, you must assume the difficulties and the hazards, but don't weep. It was a voluntary choice on your part," was, in light of defendant's conduct, entirely proper. See in this connection, Butler v. United States, 4 Cir., 1951, 191 F.2d 433, 436, where the trial judge said: "but if you are not sufficiently informed as to how to try a case in this Court you will not be allowed to try it," and the Court of Appeals, in affirming the conviction, stated: "This statement was proper in view of the conduct of counsel for defense. Attorneys have an affirmative duty to conduct themselves properly before the courts. Where counsel persists in obnoxious actions, the court must be free to warn them of any such improprieties."

See also People v. Knocke, 1928, 94 Cal. App. 55, 270 P. 468, 470, where the appellate court affirmed, even though the trial court had said: "I am surprised that any one who has gotten by the Bar Association examination should raise that question," and "if you cannot behave yourself in this court, you better go and practice in the police court." Cf., People v. Schneider, 1934, 3 Cal.App.2d 1, 39 P.2d 258, 259–260, where there was affirmance even though, after defendant stated that he would appear *pro se*, the trial court said: "You have more nerve than I have."

B. (Page 15, line 15). The cold record does not show why the Court spoke as it did. However, the Court now recalls that at the time of the ‘incident, the defendant, by tone of voice and demeanor, was doing nothing other than "grandstanding." Indeed, this conclusion is supported by the subsequent revelation of defendant that his offer had an ulterior motive, namely, the convenience of his own witnesses. In any event, the defendant's demeanor was typical of his coy remarks which can only be described as fawning in nature. See Tr., vol. VIII, p. 1841, lines 13–18 (reference, when speaking to the Court, to "I love you.").

C. (Page 15, lines 25–27). The witness in question had originally been called as a government witness on October 11, 1960. During the course of defendant's cross-examination, there was a question as to whether the witness had a certain tax receipt. At that time, the Court ordered the witness to bring the item to court. Tr., vol. III, p. 799, line 16. The record shows that on October 21, 1960, the witness was produced as a witness on behalf of the defendant. Tr., vol. VI, p. 1604, lines 8–10. The allegedly improper remarks addressed to defendant were occasioned by the fact that although, by his own admission, Tr., vol. VI, p. 1611, lines 14–25, the defendant had himself found the item in question the very night of the Court's order to the witness, the defendant waited ten days to advise the Court of such fact, thereby sending the witness, with the sanction of the Court, on a wild goose chase. The reprimand, Tr., vol. VI, p. 1612, lines 6–11, 14–18, 22–23, was entirely proper, and, if anything, should have been stronger. This particular in-

able and experienced Trial Counsel representing the plaintiff," and, on the other hand, that counsel for the government "were accorded every courtesy and consideration by the Court." In the first place, as we have suggested already and as we shall go on to discuss presently, the Court did not caution or reprimand the defendant except on those occasions when he was fully deserving of such. Secondly, there is nothing at all to show that the Court "belittled" the defendant.

stance of the defendant's lack of respect for the Court has nothing at all to do with the defendant's attempt to impeach a government witness.

D. (Page 15, lines 28–29). Initially, it will be observed that at this particular stage of the trial, the witness had already become a witness for the defendant. Tr., vol. VI, p. 1604, lines 8–10. The dispute in question was who, the witness or the defendant, had paid a certain tax, and who supplied the funds for the payment. The Court observed that there was no question but that defendant had paid money to the Internal Revenue Service. (He does not complain about that comment). But, that was not the same thing as saying that, as the defendant would have had us believe, that it was the defendant's money. In line with the well-established proposition that a federal judge may comment on the evidence already adduced, the Court merely commented that the fact that the defendant paid money to Internal Revenue did not "wipe out this witness' testimony, as I have listened to it. His position is that he may have paid you the amount of money." Tr., vol. VI, p. 1614, lines 7–9. This comment of the Court was amply supported by the witness' prior testimony, which appeared at Tr., vol. VI, p. 1607, lines 17–19. There was therefore, no attempt to "improperly underwrite the credibility of a witness for the plaintiff."

E. (Page 16, line 1). In this instance, the government was attempting to introduce into evidence the original ledger of a witness who had previously been called on behalf of the defendant. The defendant objected to its admission on the ground that a government agent was familiar with its contents and that it "just seems asinine to me to deprive the McCues * * *." Tr., vol. VII, p. 1713, lines 8–13. The Court, with a calmness not justified by defendant's conduct, merely stated: "You will have to change your vocabulary if you are going to be a lawyer. You don't intimate that anyone is asinine in court." Tr., vol. VII, p. 1713, lines 14–16. What is prejudicial about that?

F. (Page 16, line 2). In this instance the government had just completed a thorough examination of a witness. The witness was excused, and the Court asked the defendant whether he then wished to resume his cross-examination of another witness, the government's expert. The defendant, with a dismaying obliviousness to the Court's question, and with obvious reference to the government's just concluded examination, said: "I hope I can take lessons from counsel and learn to say so much about nothing." Tr., vol. VII, p. 1735, lines 10–11. The Court, refusing to let go unchallenged the defendant's uncalled for slur upon the able United States Attorney, simply responded in kind. Actually, the defendant should have been cited for contempt.

G. (Page 16, lines 22, 23). We join together these two allegations of error for they show the nature of some of the defendant's thoroughly uncalled for remarks. On one occasion the defendant stated during the course of his argument to the jury: "but counsel yesterday would make an issue of that to show how small I was—not half as small as the men I have told you about, the little men in big places in Government." Tr., vol. VIII, p. 2020, lines 11–14. Of course, the defendant could have been referring to anybody from the President to government counsel, or from Internal Revenue agents to the Court itself. The Court merely said: "Well, let's just define that a little further, because, as the Court has pointed out, the Court is making a record also. Now, who do you mean by the 'little men in big places?'" Tr., vol. VIII, p. 2020, lines 15–18. The second of defendant's remarks came shortly thereafter. He observed that certain Internal Revenue agents "are even a discredit to themselves." Tr., vol. VIII, p. 2021, lines 17–18. The Court merely observed that it had already cautioned defendant not to make remarks disparaging the character of anyone. At this time, the Court refuses to further dignify the two incidents by making additional comment.

H. (Page 16, line 24). The defendant had seen fit to inject into his argument to the jury a supposedly humorous story which we assume had no basis in fact. Whether it did or not, the fact is that the defendant was attempting to ridicule or poke fun at government agents, a device which would not be tolerated.

584

Thirdly, although the record is incapable of showing it, the occasions were many when the government counsel were on their feet, ready to make an objection which was never stated. When the misconduct of defendant was so obvious, there would have been little reason for the Court to delay its ruling until the government fully stated its position. In any event, the defendant's conduct, carried on as it was in the face of repeated explanations, cautions and reprimands of the Court, constituted nothing other than a challenge to the authority of the Court itself. Under such circumstances, we see no reason at all why the Court had to wait for objection by the government. Fourthly, as the notation in the margin indicates, there were innumerable times when the Court allowed defendant to proceed, without reprimand, although he was violating rules of evidence, procedure, or the Court.[18]

Nor, is there any merit to the allegation that the Court showed favoritism to the government counsel. The fact is,

18. The following citations to the transcript are by no means to be thought of as exhausting the instances where the Court refrained from compelling defendant to comply with the ordinary rules of evidence or of Court.

Vol. III: Page 829, line 24—p. 830, line 5.

Vol. IV: Page 878, lines 4–12, 14–19; p. 892, lines 11–18; p. 1113, lines 9–15.

Vol. VI: Page 1590, lines 2–7; p. 1604, line 23—p. 1605, line 14; p. 1631, lines 18–21; p. 1649, lines 6–8.

Vol. VII: Page 1694, line 25—p. 1695, line 9; p. 1701, line 25; p. 1704, lines 20–23; p. 1715, lines 8–15.

Vol. VIII: Page 1970, line 16—p. 1971, line 8 ("Counsel for the Government put on quite a show yesterday. Mr. Maxwell, the performer, reminded me of an incident in my childhood. You ladies and gentlemen, of course, know what a chameleon is, a lowly lizard-type animal, which can change color at will. * * * You could pick it up and place it with its surroundings, and it would immediately change color and blend in with the surroundings. Just so was Mr. Maxwell's testimony yesterday. [Note: Mr. Maxwell never testified]. He tried to make you believe that black was white; that white was black."); p. 1972, line 21—p. 1973, line 17 (during his argument, defendant related that he had moved from California, and why, and that he was making a fortune during the depression); p. 1985, lines 21–22 ("Counsel was wrong again. I do not propose to ever cash those checks."); p. 1987, lines 1–12 (comment, during argument, as to how three Presidents had permitted the public debt to increase); p. 1990, lines 6–7 (testifying in argument: "I do know that I did not receive any of it."); p. 1993, lines 7–13 ("The large exhibit, 265, could just as well have been portrayed on an ordinary letter sized sheet of paper, but, no, that would not create quite the impression that the larger sized sheet would, and, two, it would be too economical for those in charge of spending taxpayer's dollars, just as men brought from the four corners of this nation to put dividend checks in evidence * * *."); p. 1994, lines 9–13 ("Now, that is what I refer to, ladies and gentlemen, when I say there is something wrong with those who hold the purse strings to spending of our taxpayers' dollars. The Canadian Government would never do such as that. That is the height of stupidity. It is a waste of money."); p. 1996, line 22—p. 1997, line 1 ("For some reason or other the Internal Revenue Service has not approved a single tax return filed since the date of my robbery in 1952 although they had always approved settlements up to that date. Maybe the agent who has sat here all through the trial with a smirk on his face could give you the answer."); p. 1998, line 25 —p. 1999, line 3 ("Well, you know, she was obviously disturbed here and, I don't know, maybe it is because she has reached the ripe old age of thirty-one and has never known the thrill of holding hands with one of the opposite sex."); p. 2010, line 16—p. 2011, line 4 ("You know, only last night I received a telephone call from a man who told me of many incidents he knew of where the Government agents had intimidated people to make them pay taxes they did not owe, and of cases where refunds were due the taxpayer, but refused by the Government, because the Government knew full well that it would cost these persons more to obtain it than would be represented by the refund."); p. 2012, lines 7–11 ("Well, counsel for the Government must think you jurors stupid and cannot see through their unsavory tactics. They will discover that you are intelligent and alert and capable of seeing through the smoke screen they unceasingly try to lay before you."); p. 2024, lines 10–13 ("Our

of course, that they presented their case in a generally unreproachable fashion. However, as the notation in the margin shows, there were many government-fostered objections which were overruled, and when government counsel made an objectionable remark in his argument, the Court was quick to correct the record and to admonish the jury carefully.[19]

Before stating a few of the general principles of law which we believe are appropriate to this general problem, we will note initially that the fact that the attack is leveled on the Court, however much the Court would prefer not to pass upon the issues, does not relieve the Court of the duty to do so; otherwise, the granting of the motion for new trial under such circumstances would be automatic and remove discretion from the Court. As we pointed out at the beginning of this opinion, such is not the rule.

 Although defendant has labored mightily to point out the alleged indiscretions of the Court, we think it important to observe that the "questions and comments of the court must be read in their context and viewed with a perspective of the whole proceedings." Ochoa v. United States, 9 Cir., 1948, 167 F.2d 341, 344; Todorow v. United States, 9 Cir., 1949, 173 F.2d 439, 448, certiorari denied 1949, 337 U.S. 925, 69 S.Ct. 1169, 93 L.Ed. 1733; United States v. Thayer, 7 Cir.,

1954, 209 F.2d 534, 536 ("Words of the trial judge are not to be isolated for assessment. [citing the Ochoa case, supra]. Nor are specimens of his comments to be wrested out of context and measured against those intriguing generalities cited to us from various cases by defendant. While there is no single formula for gauging judicial discretion such contentions as raised by this defendant must be resolved in an environment supplied by the full record."); United States v. Warren, 2 Cir., 1941, 120 F.2d 211, 212 (where Judge Learned Hand observed that "separate passages cut from their context and from the trial as a whole, often have an apparent importance which in fact they do not deserve"); United States v. Lee, 7 Cir., 1939, 107 F.2d 522, 529–530, certiorari denied 1939, 309 U.S. 659, 60 S.Ct. 513, 84 L.Ed. 1008; Goldstein v. United States, 8 Cir., 1933, 63 F.2d 609, 614; Hargrove v. United States, 8 Cir., 1928, 25 F.2d 258, 262.

What, then, does the record show? Almost from the beginning, and certainly right up to the end, the defendant was, as we have already pointed out, engaged in a pattern of conduct that can only be described as contemptible. This, after all, was an intelligent defendant who had made a veritable fortune by use of his mind and cunning. It is inconceivable that he did not understand the repeated

counsel for the Government yesterday—which I liken to a chameleon—tried to change the color, distort and color things differently than they exist, in an effort to influence this jury."); p. 2024, line 16—p. 2025, line 23 (reads newspaper article that attempts to make a mockery of tax system.).

19. The following citations to the transcript are by no means to be thought of as exhausting the instances where the Court either gave rulings unfavorable to the government or otherwise made comments adverse to government counsel. Tr., vol. I, p. 72, line 20—p. 73, line 5; Tr., vol. II, p. 415, lines 11–12; Tr., vol. II, p. 552, lines 20–21 ("Well, counsel isn't that in effect carrying coals to Newcastle?"); Tr., vol. III, p. 788, lines 19–20 (objection overruled); Tr., vol. III, p. 830, lines 2–5 (same); Tr., vol.

IV, p. 878, lines 17–19 (same); Tr., vol. IV, p. 890, lines 1–5 (same); Tr., vol. IV, p. 898, lines 24–25 ("Now, that may satisfy you, counsel, but I would like to have a date on that."); Tr., vol. IV, p. 961, lines 10–14, (objection overruled); Tr., vol. IV, p. 1113, lines 12–15 (same); Tr., vol. V, p. 1284, lines 11–14 (same); Tr., vol. VI, p. 1575, lines 2–5 (same); Tr., vol. VI, p. 1583, lines 1–2 (same); Tr., vol. VI, p. 1590, lines 6–7 (same); Tr., vol. VII, p. 1726, lines 16–19 ("Counsel, that isn't exactly the testimony of the witness."); Tr., vol. VII, p. 1927, lines 10–18 (admonition to jury to disregard remarks made by government counsel during his argument to jury); Tr., vol. VIII, p. 2010, line 23—p. 2011, line 4 (refusal to order remarks of defendant stricken); Tr., vol. VIII, p. 2013, lines 14–16 (same).

explanations, cautions and reprimands of the Court. Yet, time after time after time, he proceeded to ignore the Court and to display an utter contempt for it. Nothing better illustrates defendant's approach than his demeanor during that part of the argument concerning the alleged burglary of his home.[20] It was not only the things the defendant did or said; it was also the manner in which he did them. One minute he would listen to the Court, and then he would arrogantly do exactly that which he was told not to do. One minute he would grin either to the jury or to the Court in a supercilious manner, and the next he would engage in biting sarcasm. The printed page does not show this; but, nobody at the trial will deny that that is what the Court faced.

The patience of the Court was sorely tried. It did its level best to restrain itself and, at the same time, preserve a certain semblance of courtroom decorum. If, upon occasion, the Court did not "choose [its] diction with the nicety of a Field or Marshall," People v. Knocke, 1928, 94 Cal.App. 55, 270 P. 468, 471, we still "must not overlook the fact that the human element cannot be entirely eliminated from the trial of lawsuits." Goldstein v. United States, supra, 63 F. 2d at page 613. We doubt that but very few judges have such thick hides that they can relegate themselves to the status of automatons. Nor should they.

But the defendant would now have us isolate the several reprimands given by the Court and then find that he was prejudiced thereby. This we refuse to do.

"Merely because a statement is made or question asked by court or counsel in the heat of a spirited trial which subsequently in the cool ivory tower of appellate court chambers seems inappropriate, does not make the stating nor the asking prejudicial error." Bush v. United States, 9 Cir., 1959, 267 F.2d 483, 488.

At least the case law is clear: in determining whether the comments of the Court were prejudicial, we may take into account the fact that it was the defendant who provoked them. Butler v. United States, 4 Cir., 1951, 191 F.2d 433, 436 ("Where counsel persists in obnoxious actions, the court must be free to warn them of any such improprieties."); United States v. Dennis, 2 Cir., 1950, 183 F.2d 201, 225–226, affirmed 1951, 341 U.S. 494, 71 S.Ct. 857, 95 L.Ed. 1137 (the leading case on the subject, wherein Learned Hand, J., noted: "The record discloses a judge, sorely tried for many months of turmoil, constantly provoked by useless bickering, exposed to offensive slights and insults, harried with inter-

---

20. The following colloquy begins at Tr., vol. VIII, p. 1974, line 21 and ends at p. 1975, line 19:

"The Court: There was no testimony, as I understand, concerning any fire [burglary] any place. If there is to be testimony, in fairness, the Government has the right to cross-examine, just the same as you had the right to cross-examine the Government witnesses. So, if you desire to bring in testimony of a fire [burglary] you should have done that through witnesses and the Government would have the right to cross-examine those witnesses. That was not done.

"Mr. Redfield: Well, your Honor, what I was about to say—

"The Court: Now, please don't argue with me. I just made a statement to you. You understand what I said.

"Mr. Redfield: Well, the New York Times stated that it was the greatest robbery of all times—

"The Court: That is all right.

"Mr. Redfield:—including the Brink's robbery.

"The Court: Just a second, I want the record to show that you have deliberately and quietly. and composedly listened to this Court advise you as to the proper scope of argument to the jury, and in that comment to you the Court pointed out that it had gone over the same subject with you in chambers. [See Tr., vol. VII, page 1890, line 1—p. 1892, line 16]. I want the record to show that after you listened, apparently respectfully, as soon as the Court had ceased its comment to you, in one rush of words you blurted out just exactly the thing the Court was telling you could not be used in argument."

minable repetition, who, if at times he did not conduct himself with the imperturbability of a Rhadamanthus, showed considerably greater self-control and forbearance than it is given to most judges to possess."); United States v. Liss, 2 Cir., 1943, 137 F.2d 995, 999, certiorari denied 1943, 320 U.S. 773, 64 S. Ct. 78, 88 L.Ed. 462; Moore v. United States, 5 Cir., 1942, 132 F.2d 47, 57, certiorari denied 1942, 318 U.S. 784, 63 S. Ct. 854, 87 L.Ed. 1151; United States v. Lee, 7 Cir., 1939, 107 F.2d 522, 529–530, certiorari denied 1939, 309 U.S. 659, 60 S.Ct. 513, 84 L.Ed. 1008; Hargrove v. United States, 8 Cir., 1928, 25 F.2d 258, 262; Magen v. United States, 2 Cir., 1928, 24 F.2d 325, 329, certiorari denied 1928, 277 U.S. 595, 48 S.Ct. 530, 72 L.Ed. 1005.

Furthermore, as evidence of the fact that the Court's comments did not prejudice the defendant, we would note that he was not "disabled in any way from doing his duty. * * * He made no claim to be disconcerted. He continued to conduct the trial with his accustomed vigor and skill." Steinberg v. United States, 5 Cir., 1947, 162 F.2d 120, 123–124, certiorari denied 1947, 332 U.S. 808, 68 S.Ct. 108, 92 L.Ed. 386. In addition, it will be noted that there is no evidence whatever that the Court "expressed even indirectly any opinion as to the guilt of the accused." United States v. Liss, supra, 137 F.2d at page 999.

Of great significance, too, is the fact that the Court carefully instructed the jury as to the reasons for its admonitions to counsel, and specifically cautioned the jury that it was to draw no inferences therefrom.[21] In light of this instruction, it is impossible to see how the comments of the Court prejudiced the defendant.

"We have carefully examined the trial record and as a result we do not believe that these comments between court and defense counsel so misled and prejudiced jurors that they became partisans of the prosecution. We cannot abandon our faith in the capacity and desire of a Federal jury to avoid being mired in irrelevancies, and the record does not reveal that the jurors in the case lost or discarded their innate sense of fair play and were inspired to render a verdict not based entirely on the evidence admitted by the court.

"This conclusion is fortified and emphasized by the important fact that the court gave specific instructions to the effect that jurors must wholly disregard court rulings and comments during the trial; that because the court had admonished and reprimanded counsel in connection with the conduct of the trial, the jury should not draw any inferences from the remarks or comments or rulings of the court on those occasions that the court was intending to convey to the jury in any manner whatsoever its view or opinion as to what the verdict should be—that (such) comments of the court were only pur-

---

21. The following instruction appears at Tr., vol. VIII, p. 2076, line 10—p. 2077, line 4:

"It is the duty of the Court to admonish an attorney who, out of zeal for his cause, does something which is not in keeping with the rules of evidence or procedure. You are to draw no inference against the side to whom an admonition of the Court may have been addressed during the trial of this case.

"By such remarks this Court did not then and does not· now intend to favor one party against the other, or to intimate to the jury what weight they should give to the evidence or what degree of credibility they should give to the respec-

tive witnesses, or to disparage in any degree any of counsel or the defendant acting as his own attorney. As to any such remarks of the Court addressed to LaVere Redfield you are to consider them to have been addressed to him as an attorney in the case—his own attorney—and not to him as the defendant in the case.

"Such remarks and comments as the Court addressed to counsel and defendant as his own attorney were for the sole purpose of enforcing the rules of evidence and procedure, and for the purpose of maintaining courtroom decorum during the course of the trial."

suant to the power and duty of the court to supervise the trial and expedite it—that (any) admonitions or reprimands were matters only between the court and the attorneys and that they cannot and must not reflect in any manner upon the guilt or innocence of the defendants.

\* \* \* \*

"These unambiguous and eminently fair instructions reach straight down into the very heart of the problem posed by appellants' contentions. If any member (or members) of the jury had felt the slightest uncertainty as to the possible attitude of the judge, these blunt admonitions were sufficient to lay any doubt at rest." Shockley v. United States, 9 Cir., 1948, 166 F.2d 704, 712, certiorari denied 1948, 334 U.S. 850, 68 S.Ct. 1502, 92 L.Ed. 1773.

See, in this connection, United States v. Angelo, 3 Cir., 1946, 153 F.2d 247, 252 ("Whatever unfavorable impression the jury may have received from certain of his remarks, the charge to the jury swept it away.").

■ Finally, we would point out that the evidence of defendant's guilt was so overwhelming that the comments of the Court were not such "as to cause a verdict to be rendered against [defendant] which otherwise would not have been found by the jury." Gariepy v. United States, 6 Cir., 1955, 220 F.2d 252, 264, certiorari denied 1955, 350 U.S. 825, 76 S.Ct. 53, 100 L.Ed. 737. See also United States v. Wheeler, 7 Cir., 1955, 219 F.2d 773, 778, certiorari denied 1955, 349 U.S. 944, 75 S.Ct. 872, 99 L.Ed. 1271; United States v. Lee, 7 Cir., 1939, 107 F.2d 522, 529–530, certiorari denied 1939, 309 U.S. 659, 60 S.Ct. 513, 84 L.Ed. 1008; Addis v. United States, 10 Cir., 1932, 62 F.2d 329, 331, certiorari denied 1933, 289 U.S. 744, 53 S.Ct. 688, 77 L.Ed. 1491; Magen

v. United States, 2 Cir., 1928, 24 F.2d 325, 329, certiorari denied 1928, 277 U.S. 595, 48 S.Ct. 530, 72 L.Ed. 1005. It is well established, of course, that in determining whether there has been prejudicial error, we may consider that, even had the error, if any, not been committed, the jury would have found defendant to be guilty in light of the overwhelming amount of virtually uncontradicted evidence against him. See Lutwak v. United States, 1953, 344 U.S. 604, 619, 73 S.Ct. 481, 97 L.Ed. 593; Thomas v. United States, 8 Cir., 1960, 281 F.2d 132, 136; Homan v. United States, 8 Cir., 1960, 279 F.2d 767, 771, certiorari denied 1960, 364 U.S. 866, 81 S.Ct. 110, 5 L.Ed. 2d 88 ("Errors of the trial court which may be prejudicial in a close criminal case, in the sense of being capable in such a situation of possibly affecting the result, can well be without any such rational possibility in a strong case, and thus not entitle the defendant to a reversal of his conviction."); United States v. Sheba Bracelets, Inc., 2 Cir., 1957, 248 F.2d 134, 145, certiorari denied 1957, 355 U.S. 904, 78 S.Ct. 330, 2 L.Ed.2d 259; United States v. Spadafora, 7 Cir., 1950, 181 F.2d 957, 959, certiorari denied 1950, 340 U.S. 897, 71 S.Ct. 234, 95 L.Ed. 650; Ippolito v. United States, 6 Cir., 1940, 108 F.2d 668, 671; Fitter v. United States, 2 Cir., 1919, 258 F. 567, 573; Johnson v. United States, 7 Cir., 1914, 215 F. 679, 685; compare Berger v. United States, 1935, 295 U.S. 78, 89, 55 S.Ct. 629, 79 L.Ed. 1314; United States v. Carmel, 7 Cir., 1959, 267 F.2d 345, 347.

B. *Allegedly prejudicial argument of government.*

■ The defendant also urges that he was denied a fair and impartial trial by virtue of the closing argument of the United States Attorney. The brief remarks in question are set out in full below.[22] A reading of them, particularly in

---

22. The following appears at Tr., vol. VIII, p. 2026B, line 18—p. 2027, line 9:

"May it please the Court, ladies and gentlemen of the jury:

"I want you to know that I will not give dignity to the remarks of Mr. Red-

field by responding to them. I have some fifteen pages of notes taken during the course of those remarks. They will be discarded.

"Ladies and gentlemen, this is a nation of law, not of men. It would appear that

light of the defendant's argument,[23] reveals that there was nothing whatsoever which was "intended to inflame the jury against the defendant." The United State Attorney spoke in a calm, deliberate manner. Nothing was said which, under the circumstances, possibly could prejudice the defendant. There was no error in allowing the remarks to stand.

### VI. There Was No Error In The Supplemental Instruction As Given By The Court.

Defendant also complains that this Court erred when it gave the jury a supplemental instruction mid-way through its deliberations. Specifically, defendant objects to this Court's failure to include in the so-called Allen-type instruction a reference to the rules that the defendant is presumed to be innocent and that the government must prove guilt beyond a reasonable doubt. The instruction in question appears at Tr., vol. VIII, p. 2103, line 1—p. 2104, line 22.

Initially, we hasten to point out that defendant has waived his right to raise this particular allegation of error. This is because, in conformity with the practice as set out in Rule 30, Federal Rules of Criminal Procedure, this Court specifically inquired of both parties whether they had any objections to the instruction as given, and the defendant, as well as the government, responded in the negative. Tr., vol. VIII, p. 2105, lines 1–20. Since, as we have indicated earlier, defendant should be given no special advantage because he appeared *pro se*, he

this financial baron of Mount Rose is above the law. He has shown an arrogant contempt for my office, of this Court, of the United States and its many institutions. I am disgusted and indignant by his conduct here in court today, and for him I must apologize to the Court and to this jury.

"You are called upon to render your verdict on the evidence and the testimony adduced at this trial, nothing else. I ask only one thing, that you do justice to this defendant, that you do justice to the United States."

23. In addition to the examples set out in footnote 18, we cite the following passages from the defendant's argument: Tr., vol. VIII, p. 1994, lines 15–17 ("One of the Government men has boasted that those costs [of defendant's trial] to date have run in excess of $50,000.00 he believes."); p. 1995, lines 5–9 ("I guess it is just the habit these men have and the way that—the habit they have fallen into in spending taxpayers' dollars; the habit of spending the funds of this nation of these taxpayers with reckless abandon."); p. 2007, lines 17–20 ("You know, Mr. Morvay was subpoenaed by the plaintiff to testify in this case. Why was he not put on the stand? You know, Morvay was scheduled to be indicted by the grand jury for using the mails to defraud."); p. 2008, lines 5–6 ("The reason doesn't speak well of those in public office, some of them, too—"); p. 2008, lines 11–14 ("Well, anyway, in this Government we do have some little men

serving in big jobs, little men who are so small that they would have to stand on a soap box to stroke the fur on the back of a common house cat."); p. 2009, line 1 ("You know, some of the two-bit employees—"); p. 2009, lines 10–17 ("The Court: That is what I thought you said, Mr. Redfield. Is that a correct transcription of your first [and just quoted supra] statement? Mr. Redfield: Yes. The Court: Go ahead. Mr. Redfield:— who are in the Internal Revenue Service —the Service of Eternal Revenue—would not hesitate to put an innocent man behind prison bars if, by so doing, it would serve a promotion in his own job."); p. 2012, line 24—p. 2013, line 7. ("Mr. Redfield: Thank heaven I live in a country where I do not have to sit by and put up with the Gastapo tactics, and which do not have to be endured by any of us; where I can at least be judged by at least twelve men and women of my equal. If such is allowed to continue none of us is safe; none of us will be able to tell when he will be next. The Court: If what is allowed to continue? Mr. Redfield: The tactics of the Revenue Service. You don't know when you might be singled out for special treatment."); p. 2020, lines 11–14 ("but counsel yesterday would make an issue of that to show how small I was—not half as small as the men I have told you about, the little men in big places in Government."); p. 2021, lines 16–18 ("but there are a few which certainly are not a credit to their fellow employees; they are even a discredit to themselves.").

comes within the well-established general rule that failure to object to an instruction results in a waiver of the right to assign that instruction as error. See Cooper v. United States, 9 Cir., 1960, 282 F.2d 527, 534; Ryan v. United States, 9 Cir., 1960, 278 F.2d 836, £39; Harris v. United States, 9 Cir., 1958, 261 F.2d 897, 902; Davenport v. United States, 9 Cir., 1958, 260 F.2d 591, 595, certiorari denied 1959, 359 U.S. 909, 79 S.Ct. 585, 3 L.Ed.2d 573; Pool v. United States, 9 Cir., 1958, 260 F.2d 57, 66.

 Quite aside from this procedural defect in defendant's position, however, we are also of the view that there is no merit to his position as a matter of substantive law. This is mainly because we are unimpressed with defendant's implicit argument that just because some courts have chosen to give an instruction in a given form, it is error to depart therefrom.

As the transcript demonstrates, the language used by this Court was significantly different from that condemned in the case which defendant cites. Billeci v. United States, 87 U.S.App.D.C. 274, 184 F.2d 394, 399, 24 A.L.R.2d 881. It is, therefore, inapposite.

More importantly, the defendant's very argument was brought to the attention of the Court of Appeals for the Fourth Circuit, but rejected in the case of Orton v. United States, 4 Cir., 1955, 221 F.2d 632, 635–636, certiorari denied 1955, 350 U.S.

821, 76 S.Ct. 47, 100 L.Ed. 734. There, Chief Judge Parker observed:

"Complaint is made, too, that the judge did not repeat his charge on presumption of innocence and reasonable doubt when giving the supplemental instruction; but we think he could very well assume that the jury had in mind instructions which he had given only an hour and a half before. Jurors should be given credit for having ordinary intelligence; and if there is one doctrine of the criminal law which they probably understand better than any other it is the presumption of innocence and the burden resting upon the prosecution to establish guilt beyond a reasonable doubt. Nothing said in the supplemental charge had any tendency to becloud this doctrine and there was no reason to repeat what had been said plainly with regard thereto."

In addition to the fact that upon giving the supplemental instruction the Court suggested to the jury "that you again retire and carefully consider all of the evidence in the light of the Court's instructions, a copy of which you have with you," Tr., vol. VIII, p. 2104, lines 17–19, those instructions made clear reference to the presumption of innocence and/or the requisite burden of proof on at least thirteen different occasions, and two of the instructions dealt at length with the subject.[24]

24. The following references are all to Tr., vol. VIII: Page 2039, lines 20–23 (each element must be proved beyond reasonable doubt); p. 2042, lines 14–18 ("If, upon consideration of the evidence, you find beyond a reasonable doubt that the total taxable income * * * was willfully understated in a substantial amount with specific intent to evade * * *."); p. 2042, lines 23–25 (reasonable doubt that the offenses were committed on certain dates); p. 2043, lines 5–6 (must prove act and intent beyond reasonable doubt); p. 2043, lines 8–12 (willfully unreported income beyond reasonable doubt); p. 2043, line 14—p. 2044, line 13 (lengthy instruction setting forth pre- sumption of innocence, burden of proof is on government, and concept of reasonable doubt); p. 2044, lines 14–17 (reasonable doubt defined); p. 2044, lines 18–19 ("The Government must prove every element of each offense charged beyond a reasonable doubt."); p. 2046, lines 17–18 (law presumes that person is innocent of crime or wrong); p. 2051, lines 1–4 (requisite intent must be proved beyond reasonable doubt); p. 2056, lines 3–14 (reasonable doubt that defendant did the acts charged); p. 2058, lines 14–23 (fraud beyond reasonable doubt); p. 2071, lines 5–10 (intent to evade beyond reasonable doubt).

Finally, we would cite those cases where the various Courts of Appeals, including our own, have approved the Allen-type instruction even though it did not contain references to reasonable doubt. Suslak v. United States, 9 Cir., 1914, 213 F. 913, 919; Sikes v. United States, 5 Cir., 1960, 279 F.2d 561, 562; Kleven v. United States, 8 Cir., 1957, 240 F.2d 270, 273 (opinion by the now Mr. Justice Whittaker); Johnson v. United States, 4 Cir., 1925, 5 F.2d 471, 476, certiorari denied sub nom. Eick v. United States, 1925, 269 U.S. 574, 46 S.Ct. 101, 70 L.Ed. 419; Shaffman v. United States, 3 Cir., 1923, 289 F. 370, 374 (also noting, at page 375, that "the trial judge, however, is vested with a wide latitude of discretion.").

## VII. Conclusion.

The gist of defendant's reasons in support of his motion is that the Court, by action (or failure to act) and by comment so prejudiced the defendant that he is deserving of a new trial. As we pointed out at the beginning of this opinion, the burden was on him to sustain the proposition. This he has not done. This is because, even as an abstract proposition, we fail, in all humility, to find any error. But, even assuming solely for purpose of argument, that there were errors, we think it appropriate to note the statement of the Supreme Court in Lutwak v. United States, 1953, 344 U.S. 604, 619, 73 S.Ct. 481, 490, 97 L.Ed. 593: "A defendant is entitled to a fair trial but not a perfect one." That he received a fair trial is fully demonstrated by the record taken in context and as a whole. Having chosen, in a competent, intelligent and understanding manner, to defend himself, he proceeded to set himself apart from, if not above, the law. No court need tolerate such conduct. He insists on another trial, despite the overwhelming evidence of his guilt, because this Court did not accord to him special privileges which were not his due. "Surely judges did not win their freedom from the crown only to lose it to those who set themselves against the sovereign." United States v. Christakos, D.C.N.D.Ala.1949, 83 F.Supp.

521, 525, affirmed sub nom. Woolard v. United States, 5 Cir., 1949, 178 F.2d 84.

The interest of justice will not be served by the granting of a new trial. The motion will be denied.

## VIII. Order

It is the Order of this Court that the defendant's motion for a new trial be, and the same hereby is, denied.